186 N.J. Super. 138 (1982)
451 A.2d 980
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN T. GREGORIO, DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided August 18, 1982.
*140 Mary L. Cupo, Deputy Attorney General, argued the cause for the State (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Charles E. Waldron, Deputy Attorney General, of counsel).
Brown, Brown & Furst, attorneys for defendant (Henry F. Furst of counsel and on the brief).
Marci Levin Hochman, Assistant Legislative Counsel, argued the cause for amicus curiae New Jersey State Legislature (Albert Parroni, Legislative Counsel).
*141 BAIME, J.S.C. (temporarily assigned).
This case presents difficult questions of great public concern. At issue is whether the separation of powers doctrine[1] or the speech or debate clause[2] of the New Jersey Constitution precludes the prosecution of a State Senator for wilfully providing false information in a financial disclosure statement filed pursuant to the Conflicts of Interest Law.[3] Other questions pertain to whether a criminal prosecution in this factual context contravenes constitutional provisions which invest the Legislature with the power to "judge [the] qualifications of its own members"[4] and confer upon it the authority to "punish [them] for disorderly behavior."[5] Because of the transcendent importance of the issues raised, the State Senate requested and was granted leave to appear in the role of amicus curiae.
These questions are presented within the context of a motion to dismiss several charges contained in a multicount indictment returned by the state grand jury. In essence, the indictment alleges that defendant, a State Senator, failed to report income received from the gross receipts of two licensed liquor establishments in financial disclosure statements filed with the Joint Legislative Committee on Ethical Standards. These reports were submitted pursuant to the code of ethics adopted by both houses of the Legislature in a joint resolution under the Conflicts of Interest Law. The State contends that defendant's failure to disclose such income constitutes a violation of N.J.S.A. 2C:28-7. That statute proscribes the making of a false entry in any record or document "received or kept by the government for information."
*142 Defendant's motion is grounded upon the claim that the filing of a fraudulent financial disclosure statement does not constitute a criminal offense within the purview of N.J.S.A. 2C:28-7. The principal thrust of defendant's argument is that the judiciary lacks jurisdiction to adjudicate a criminal prosecution where the conduct comprising the offense also constitutes a violation of the legislative code of ethics. This contention is predicated upon the argument that review of a code of ethics violation rests solely with the Joint Legislative Committee on Ethical Standards. Defendant thus asserts that the present prosecution constitutes an unconstitutional intrusion by the Executive Branch into an essentially legislative domain. As such, defendant argues that the indictment is violative of the separation of powers doctrine. Defendant also contends that the privileges and immunities accorded legislators by the speech or debate clause preclude prosecution. It is argued that the submission of a financial report pursuant to the code of ethics constitutes a legislative act immune from review by the Executive and Judicial Branches.
The argument advanced by the Senate is somewhat related. More specifically, the Senate contends that the code of ethics was adopted pursuant to the rule-making power accorded each house to "determine the rules of its proceedings, and punish its members for disorderly behavior." N.J. Const. (1947), Art. IV, § 4, par. 3. It is the Senate's contention that the requirement of filing financial disclosure statements constitutes an internal rule promulgated by the Legislature to police its own members, in furtherance of its constitutional duty to judge their qualifications and insure proper discipline. Succinctly stated, the Senate argues that the present prosecution constitutes an unlawful arrogation of power by the Executive Branch.

I
These novel questions must be considered within the context of New Jersey's efforts to combat official corruption and advance *143 public confidence in its governmental institutions. Perhaps it bears repeating that our government is founded upon trust. We entrust those who govern with broad powers to formulate and implement public policy and "we have faith that they will properly perform their obligation." Hyland, "Combatting Official Corruption in New Jersey, "3 Crim. J.Q. 164 (1975). It has long been recognized that public officials "stand in a fiduciary relationship to the people whom they have been elected or appointed to serve." Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474 (1952). In performing their responsibilities, members of government act as trustees of the public weal and, thus, are "under an inescapable obligation to serve the [people] with the highest fidelity." Ibid. These principles are not mere platitudes. They represent the first rule of good government.
History has sadly revealed that public trust in government and its officers has often been misplaced and that "a lack of accountability breeds public ineptitude, waste and criminal misconduct." Hyland, op. cit., at 164. It has been observed that although our government is one of law, it is managed by men and women "who are not immune from human frailties." Id. at 165. Lawlessness is an evil in itself. When a public official strays, the harm is particularly acute, because his activities are inimical to the public interest.
The Conflicts of Interest Law was one of many measures enacted by the Legislature to protect the public against official corruption. Its articulated objective was to insure that the "conduct of public officials and employees shall hold the respect and confidence of the people." N.J.S.A. 52:13D-12(a). To implement the legislative aim that "officials avoid conduct which is in violation of the public trust," ibid., the statutory scheme established broad standards and guidelines. N.J.S.A. 52:13D-12. Additionally, the law mandated that each governmental agency formulate a code of ethics adapted to its particular needs and conditions. N.J.S.A. 52:13D-12(b) and 23(a). Within this unique statutory scheme, the Legislature is designated a state "agency" N.J.S.A. 52:13D-13(a). The chief presiding *144 officer of each legislative house is to serve as head of the state agency. N.J.S.A. 52:13D-13(d)(2). Jurisdiction to administer and enforce the legislative code of ethics is vested in the Joint Legislative Committee on Ethical Standards.[6] Among the powers conferred upon the joint committee is the authority to "initiate, receive, hear and review complaints regarding violations of the statutory provisions of the Act and the code of ethics." N.J.S.A. 52:13D-22(h). A violation by a member of the Legislature subjects the offender to a fine of between $100 and $500. Ibid. A member who is found guilty by the joint committee is subject to "such further action as may be determined by the house of which he is a member." N.J.S.A. 52:13D-22(j). Under the act, the joint committee is to report its findings and recommendations to the appropriate house. Ibid. However, it is the sole responsibility of the house to determine what further action, if any, shall be taken against such member." Ibid.
Pursuant to its mandate, the Legislature adopted a code of ethics every two years following enactment of the Conflicts of Interest Law in 1971.[7] Nevertheless, the requirement that members submit financial disclosure statements was first promulgated in 1980. The applicable provision states that each member is required to file such a statement within 60 days of the adoption of the code. Legislative Code of Ethics, Fitzgerald's Legislative Manual, § 2.14a (1981). The disclosure statement, which is prescribed by the joint committee, is to set forth the member's sources of income and those of his spouse and minor children during the preceding calendar year. Ibid. The *145 code further provides that the failure of a member to file a statement is to be reported to the President of the Senate or Speaker of the General Assembly. Ibid. The joint committee is empowered to prepare advisory opinions that a particular category of income, reimbursement or gift gives rise to an appearance of a conflict of interest. Ibid. Once filed, a financial disclosure statement becomes a public record which must be retained for a period of five years and made accessible for inspection. Id. at § 4.4.

II
As noted previously, defendant contends that the present prosecution is barred by the separation of powers doctrine. Although there was no provision in the 1776 Constitution distributing powers among the three branches of government, the doctrine is fundamental to our organic law. It has been hailed as the great "contribution of Anglo-American lawyers to the prevention of absolutism and the preservation of the right of the individual against the state." Mulhearn v. Federal Shipbuilding and Dry Dock Co., 2 N.J. 356, 364 (1949). See, also, Heckel, "Constitutional Law," 3 Rutg.L.Rev. 42, 43 (1949). The doctrine "expresses a profound belief that the concentration of governmental power increases the potential for oppression, and that fragmentation ... helps insure its temperate use." General Assembly v. Byrne, 90 N.J. 376, 381 (1982). Distribution of governmental authority was not designed to promote efficiency. Its very purpose was to create friction, thereby saving the people from autocracy. Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandeis, J. dissenting).
It is a far different thing to suggest, however, that the separation of powers doctrine is to be construed as creating "three mutually exclusive watertight compartments." Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57 (1950). Such a complete "hermetic sealing off of the three branches" would render government unworkable. Buckley v. Valeo, 424 U.S. 1, 121, 96 *146 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). See, also, General Assembly v. Byrne, supra, 90 N.J. at 382; State v. Leonardis, 73 N.J. 360, 370 (1977); David v. Vesta Co., 45 N.J. 301, 324 (1965). "[T]he doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission." Brown v. Heymann, 62 N.J. 1, 11 (1972).
The present prosecution presents precisely the type of cooperation and coordinated activity that is envisioned in the foregoing cases. While the filing of a financial disclosure statement falls within the legislative realm, it can hardly be argued that the application of criminal penalties for willfully providing false information impairs any of the procedures adopted by our Legislature to implement the statutory mandate. To the contrary, criminal prosecution in such a case plainly advances the legislative goal. The factual pattern presented here merely reflects the parallel responsibilities exercised by disciplinary bodies, the Attorney General and the county prosecutors. Other examples of concurrent jurisdiction are readily apparent. For example, the exclusive authority to supervise and discipline attorneys rests with the Supreme Court. N.J. Const. (1947), Art. VI, § 2, par. 3. See, also, In re Logan, 70 N.J. 222, 225 (1976), on reh. 71 N.J. 583 (1976). Nonetheless, no one currently disputes the power of the executive to prosecute an errant attorney whose conduct constitutes both an ethical violation and a crime. Nor could anyone reasonably contend that the courts are powerless to exact criminal penalties and to disbar such an individual simultaneously. See, e.g., Stein v. Shaw, 6 N.J. 525, 527, (1951). So, too, no preemptive effect is accorded the statutory scheme under which physicians and other professionals are subject to both criminal prosecution and disciplinary proceedings. State Board of Med. Exam'rs v. Weiner, 41 N.J. 56 (1963).
Stripped to its essentials, defendant's argument is premised upon a presumed legislative design to reserve to the joint committee the authority to punish members who violate the Conflicts of Interest Law. It is further argued that the remedies *147 for such transgressions set forth in the statutory scheme are exclusive even in instances in which the member's conduct plainly falls within the purview of a criminal statute. To accept defendant's theory, one must subscribe to the view that the Legislature intended to make its members super-citizens shielded from criminal prosecution by sheer virtue of their public office. Thus, if a legislator were to accept any compensation or gift for his services on any matter related to his official duties, such conduct would be reviewable only by the joint committee. He could not be prosecuted for bribery because his criminal conduct would also fall within the proscription of the code of ethics. In a similar vein, if a legislator were to have an undisclosed interest in a venture and were he to corruptly use his official position to promote or further that interest, he could not be prosecuted for misconduct in office. In such a case, his activities would constitute a violation of the legislative code of ethics and, hence, criminal penalties would be barred. In short, defendant's argument presupposes an intent on the part of the Legislature to grant its members broad transactional immunity for conduct which has historically been the subject of criminal prosecution. See, e.g. State v. Begyn, 34 N.J. 35 (1961); State v. Furey, 128 N.J. Super. 12 (App.Div. 1974), certif. den. 65 N.J. 578 (1974); State v. Seaman, 114 N.J. Super. 19 (App.Div. 1971), certif. den. 58 N.J. 594 (1971), cert. den. 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 662 (1972). The very statement of the proposition leads to the conclusion that such could not have been the legislative design. Such a result is at odds with logic, contrary to public policy, and would constitute a perversion of the legislative objective to foster the "respect and confidence of the people" in our representative form of government. N.J.S.A. 52:13D-12(a).
The power of the Legislature to enforce its own code of ethics, to assess monetary penalties and to pursue further action, including expulsion of a member, does not divest the Executive Branch of the authority and obligation to prosecute criminal conduct. The Legislature is at liberty to deal with defendant as *148 it sees fit, subject only to its own rules and constitutional strictures. Such authority does not strip the Executive Branch of the constitutional obligation to "take care that the laws be faithfully executed." N.J. Const. (1947), Art. V, § 1, par. 11. Nor can it be construed to encroach upon that sphere of responsibility constitutionally dedicated to the judiciary. N.J. Const. (1947), Art. VI, § 1, par. 1. See also Knight v. Margate, 86 N.J. 374, 375 (1981). A contrary construction of the statute would render nugatory the very purpose for which the Conflicts of Interest Law was enacted.
It is true that the Legislature expressly provided criminal penalties when it enacted N.J.S.A. 19:44B-6(b)[8], which makes it a crime of the fourth degree for a candidate to wilfully and knowingly file any financial disclosure statement which is false, inaccurate or incomplete in any substantial or material manner. N.J.S.A. 19:44B-1 et seq. empowers the Election Law Enforcement Commission to conduct hearings and to assess monetary penalties in the event a candidate files a false financial disclosure statement. N.J.S.A. 19:44B-8. Both amicus and defendant point to N.J.S.A. 19:44B-6(b) and assert that its inclusion of criminal penalties conclusively demonstrates the Legislature's intent to accord different treatment to its own members.[9] Although this argument has some superficial appeal, the contention is grounded in speculation. Nothing has been presented to disclose that such conduct by a candidate would not fall within *149 the criminal proscription set forth in N.J.S.A. 2C:28-7. Instead, N.J.S.A. 19:44B-6(b) is indicative of a legislative design to further the general statutory scheme of N.J.S.A. 2C:28-7 rather than crippling it as it applies to candidates for public office. It is to be noted in that regard that a candidate who wilfully and knowingly files a false financial statement is guilty of a crime of the fourth degree and is thus subject to imprisonment for a maximum period of 18 months. N.J.S.A. 2C:28-7 makes it a disorderly person offense for one to knowingly make a false entry in a record kept by the government unless the purpose is to "defraud or injure anyone," in which case the crime is one of the third degree. The Legislature may well have concluded that a six-month jail sentence is inadequate punishment with respect to a candidate who files a false financial statement without harboring the intent to defraud, and, thus, enactment of a separate statute was necessary to increase the applicable penalty. A compelling argument can be made that similar conduct by an incumbent office-holder bears consequences which are far less severe since such activity does not directly impair the electoral process. In any event, it is likely that enactment of N.J.S.A. 19:44-6(b) was intended to supplement the provisions of N.J.S.A. 2C:28-7 as they relate to candidates. See Clifton v. Passaic Cty. Bd. of Tax., 28 N.J. 411, 421 (1958), and State v. Walker, 131 N.J. Super. 547, 550 (App.Div. 1974), which hold that where general and specific statutes are enacted on the same subject and not inconsistent, they are to be harmonized and accorded full effect. See also, State v. Gledhill, 67 N.J. 565, 573-577 (1975); State v. States, 44 N.J. 285, 291-292 (1965); State v. Convington, 113 N.J. Super. 229, 238-239 (App.Div. 1965), aff'd 59 N.J. 536, 537-538 (1971).
To be sure, penal statutes are to be strictly construed. In re DeMarco Suspension, 83 N.J. 25, 36 (1980); State v. Smith, 22 N.J. 59, 64 (1956). So, too, often a comparative analysis of contemporaneous statutory schemes may, because of contrasting language applicable to similar subject matter, be indicative of an intent or purpose on the part of the Legislature to provide *150 different treatment. See, e.g., State v. Maguire, 84 N.J. 508, 524-525 (1980); Malone v. Fender, 80 N.J. 129, 136 (1979); Smith v. Hazlet Tp., 63 N.J. 523, 527 (1973). On the other hand, the Legislature is presumed to be conversant with its own enactments. Quaremba v. Allan, 67 N.J. 1, 14 (1975); State v. Federanko, 26 N.J. 119, 125 (1958). The crime of tampering with public records or information is included in a comprehensive general statute and was enacted in 1979. As such, it has prospective application to situations which may be unknown or nonexistent at the time of its enactment but which nevertheless fall within its general purview and scope. See Safeway Trails v. Furman, 41 N.J. 467, 477 (1964), app. dism. 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964); State v. New Jersey Dairies, 101 N.J. Super. 149, 153 (App.Div. 1968). The unmistakable designation of financial disclosure statements as public records, coupled with the prior enactment of N.J.S.A. 2C:28-7, presumably establishes the Legislature's knowledge and purpose to expose a legislator to criminal sanction for knowingly filing a false financial disclosure statement. Nonetheless, legislative intent may not be garnered through surmise or external considerations of some unexpressed design. Dacunzo v. Edgye, 19 N.J. 443, 451 (1955). The courts "must avoid the realm of metaphysics in the exercise of the interpretive process." State v. Smith, supra, 22 N.J. at 64. All maxims of statutory construction are at best mere aids to interpretation. Indeed, the mere recitation of several of the rules of construction discloses their lack of worth in resolving the issues presented here. Proponents of the theory of sociological jurisprudence might well conclude from a reading of the cases that the courts summon one line of decisions and then another, depending upon the result they seek to achieve. Cardozo, The Nature of the Judicial Process (1921). Nor has extensive research provided guidance. The most that can be said is that application of various rules of statutory construction here produces conflicting results. In the final analysis, one must rely on the common sense of the situation. Construction of the statutory scheme must turn on the "breadth of the *151 objectives of the legislation" and the policies underlying its enactment.[10]Jersey City Chap. Prop. Owner's, etc. v. City Council, 55 N.J. 86, 100 (1969).
Here, the language of N.J.S.A. 2C:28-7 is crystal clear. The statute leaves no room for doubt that documents received or kept by the government include those items submitted to the Legislature pursuant to the code of ethics.[11] A contrary construction would subvert the legislative goal. Thus, the present prosecution does not violate the separation of powers doctrine.

III
Defendant also contends that the filing of a financial disclosure statement constitutes a legislative act immune from review by the Executive and Judicial Branches. Our Constitution provides that "for any statement, speech or debate in either house or at any meeting of a legislative committee, [members of the Senate and General Assembly] shall not be questioned in any other place." N.J.Const. (1947), Art. IV, § 4, par. 9. The purpose of the clause is to protect legislators not only from the results of criminal and civil litigation, "but also from the burden of *152 defending themselves." Dombrowski v. Eastland, 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967). If defendant is immune from criminal liability, the prosecution must be dismissed immediately, for he may "not be questioned in any other place." Thus, a motion to dismiss the indictment is an appropriate vehicle for resolution of the question presented. See United States v. Helstoski, 635 F.2d 200, 206 (3 Cir.1980). See, also, Hutchinson v. Proxmire, 443 U.S. 111, 123, 99 S.Ct. 2675, 2682, 61 L.Ed.2d 411 (1979).
Historically, the speech or debate clause was designed to "prevent intimidation by the executive and accountability before a possibly hostile judiciary." United States v. Johnson, 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). "[I]nstigation of criminal charges against critical or disfavored legislators was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the speech or debate clause." Id. at 182, 86 S.Ct. at 756. See, also, Reinstein and Silverglate, "Legislative Privilege and the Separation of Powers," 86 Harv.L.Rev. 1113, 1120-1144 (1973). The clause had its genesis in English history. Nonetheless, it must be interpreted in light of the American experience and in the context of New Jersey's constitutional scheme of government. Unlike the English system in which Parliament is the supreme authority, the Legislature in New Jersey is a coordinate branch. New Jersey's speech or debate clause, like that of its federal counterpart, was designed to preserve legislative independence, not supremacy. The clause must be applied to insure the independence of the Legislature without modifying the constitutional balance of the three co-equal branches of government. The issue presented here must thus be considered within the context of this historical purpose.
The prophylactic object of the clause is to protect the integrity of the legislative process. To be immune from executive and judicial review, the conduct of the member must be *153 within the sphere of legitimate legislative activity. In defining the contours of the immunity granted by the clause, Justice Pashman recently had occasion to review the numerous federal decisions bearing upon the question. Gilbert v. Gladden, 87 N.J. 275, 292 (1981) (dissenting opinion). Quoting from Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), the Justice stated (at 293) that the conduct must be an "integral part of the deliberative and communicative processes by which members participate in committee and house proceedings with respect to the consideration and passage or rejection of proposed legislation...." See, also, Van Riper v. Tumulty, 26 N.J. Misc. 37, 42-46, 56 A.2d 611 (Sup.Ct. 1948). A legislative act has consistently been defined as one "generally done in [the Legislature] in relation to the business before it." United States v. Helstoski, 442 U.S. 477, 488, 99 S.Ct. 2432, 2439, 61 L.Ed.2d 12 (1979). See, also, Doe v. McMillan, 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973); United States v. Brewster, 408 U.S. 501, 525, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972). However phrased, it is clear that only where a legislator's conduct falls within a legitimate sphere of legislative activity does the speech or debate clause protect against judicial and executive inquiry and review.
Judged by this standard, the submission of a financial disclosure statement does not constitute a part of the legislative or deliberative process protected by the Constitution. A criminal prosecution for the offense of falsifying governmental records will not call into question defendant's role in the integral functions of the Senate. Nor will it impair the ability of any member to participate effectively in legislative deliberations. In sum, defendant was not performing a legislative act when he submitted the financial disclosure statement pursuant to the code of ethics. Hence, his conduct should not be clothed with the immunity accorded legislators by the speech or debate clause.

*154 IV
The final question to be addressed pertains to the argument advanced by amicus that the requirement of financial disclosure statements constitutes a legislative rule beyond the power of the executive to enforce. The core of this contention is that the code of ethics was given life through the inherent rule-making power conferred by the Constitution on the Legislative Branch. N.J. Const. (1947), Art. IV, § 4, par. 3. Characterizing the source of the financial disclosure requirement in that context, amicus reasons that the Judicial Branch of government lacks jurisdiction to entertain the instant prosecution. Amicus also asserts that the present prosecution constitutes an unwholesome precedent infringing upon an area constitutionally reserved to a coordinate branch  the Legislature.
The short answer to the argument advanced by amicus is that the code of ethics and hence the requirement that financial disclosure statements be filed with the joint committee were adopted pursuant to the Conflicts of Interest Law, not by virtue of the constitutional authority of the Legislature to make rules and punish members for disorderly behavior. The constitutional rule-making power of the Legislature is generally exercised in the context of establishing standards to provide for the orderly and efficient conduct of legislative proceedings. See Parker v. Merlino, 493 F. Supp. 381, 389 (D.N.J. 1980), aff'd 646 F.2d 848, 854 (3 Cir.1981); Application of Lamb, 67 N.J. Super. 39, 57 (App.Div. 1961), aff'd o.b. 34 N.J. 448 (1961). The code of ethics provision requiring the filing of financial statements stands upon an entirely different footing. As noted in the Attorney General's brief, the Legislature made a clear procedural election when it adopted a code of ethics and characterized it as an agency rule. It cannot be said that the code was adopted pursuant to a power demonstrably committed to the Legislative Branch of government by the text of the Constitution. Simply stated, it was adopted pursuant to the Conflicts of Interest Law, not by virtue of a rule promulgated pursuant to the constitutional *155 responsibility of the Legislature to establish its own procedures.
The distinction between the rule-making power and the authority to establish standards of conduct under the Conflicts of Interest Law was recently noted by the Appellate Division in Joint Leg. Comm. on Ethical Standards v. Perkins, 179 N.J. Super. 352 (1981). There defendant, a legislator, was alleged to have violated the Conflicts of Interest Law. The joint committee assessed a penalty and subsequently instituted suit to collect the fine. Defendant contended that the constitutional authority of each house to punish its members was exclusive and, therefore, delegation of such power to the joint committee was unlawful. In rejecting this argument the court noted that the Conflicts of Interest Law is a general legislative enactment applicable to all state officers, employees and members of the Legislature. In that regard, the statutory scheme is "as much a general law as the criminal law of the State, for violation of which any person, including a legislator, may be subject to a prescribed penalty." Id. at 359. So posited, the court refused to construe the Legislature's constitutional rule-making authority as prohibiting enactment of general laws applicable to those classes of person appropriate to its subject. Id. at 361.
Amicus' contention would fare no better even assuming adoption of the code of ethics was by virtue of the Legislature's constitutional rule-making authority. There is no doubt that rules adopted by the Legislature are not reviewable by the judiciary except upon constitutional grounds. Gewertz v. Joint Leg. Comm. on Ethical Standards, 132 N.J. Super. 435, 436 (App.Div. 1975), certif. den. 68 N.J. 156 (1975). This much conceded, there exists no corollary that the judiciary is stripped of its constitutional power and obligation to adjudicate cases before it. Nor is a legislator insulated from the reach of a penal statute because his conduct also violates a procedural rule adopted by the Legislature. Cf. In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897). Here, defendant is charged with *156 commission of a criminal offense, not with a violation of a legislative rule. The motion to dismiss the indictment is therefore denied.

V
This case has been well argued by all counsel. What follows is not designed to denigrate those arguments or belittle the positions they have advocated. Left unsaid thus far are certain propositions so deeply embedded in our jurisprudence that they rarely find expression. Perhaps those values which go to the very heart of our democratic system of government need restating. The first is that no man is beyond the reach of the law. And the second is that those privileged to make the laws are obliged to obey them and live within their prescriptions.
NOTES
[1] N.J. Const. (1947), Art. III, par. 1.
[2] N.J. Const. (1947), Art. IV, § 4, par. 9.
[3] N.J.S.A. 52:13D-12 et seq.
[4] N.J. Const. (1947), Art. IV, § 4, par. 2.
[5] N.J. Const. (1947), Art. IV, § 4, par. 3.
[6] The predecessor statute, N.J.S.A. 52:13D-9, initially established the joint committee. The joint committee is composed of eight members. The President of the Senate and the Speaker of the General Assembly are each to appoint four members, no more than two of whom can be of the same political party. N.J.S.A. 52:13D-22.
[7] The Conflicts of Interest Law requires the Legislature to adopt a code of ethics by concurrent resolution. N.J.S.A. 52:13D-23(a) and (c). The life of the resolution and, hence, the code of ethics, is coextensive with that of the Legislature. Therefore, a code of ethics must be adopted every two years.
[8] N.J.S.A. 19:44B-1 et seq. was enacted in 1981.
[9] Senate Bill 1286 (1980) was first introduced on May 15, 1980, contemporaneously with consideration of the code of ethics requirement for the filing of financial disclosure statements. The Statement to the bill recites that its purpose is to require "filing by law to the same extent as is required of members of the Legislature under the proposed legislative code of ethics." The sources of earned and unearned income which must be disclosed by both a candidate and an incumbent legislator are identical except that the candidate must report an ownership or control of any land or building located in a city in which casino gambling is authorized. N.J.S.A. 19:44B-4(a) to (f); Legislative Code of Ethics, supra at § 2:14(a)(1) to (5).
[10] Although by no means dispositive, it is perhaps relevant that former Governor Cahill strongly noted his objections to the concept of "legislative self-evaluation" when he signed the predecessor statute. See "Remark in Connection with the signing of S-493, `The New Jersey Conflicts of Interest Law,'" October 30, 1967. The Governor stated:

It is imperative that no suspicion concerning the bona fides of the legislature be given a basis for existence. In a society which derives its order from the consent of the governed, men in public office not only should do justice but also should satisfy the people that justice has been done... It is not difficult to forecast that the exoneration of an accused legislator by the membership of his House would be attended by suspicion that the charge was neither diligently investigated nor disposed of on its merits.
See, also, Wilson, "Legislative Ethics In New Jersey," 1 Seton Hall Leg. J. 39, 46 (1975).
[11] N.J.S.A. 2C:27-1(b) defines "government" as including any "branch, subdivision or agency...." As noted previously, the Legislature is considered a state agency under the Conflicts of Interest Law.