202 N.J. Super. 578 (1985)
495 A.2d 507
STATE OF NEW JERSEY PLAINTIFF,
v.
WILLIE E. SMITH, DEFENDANT.
Superior Court of New Jersey, Law Division Criminal, Essex County.
Decided April 19, 1985.
*580 Lawrence L. Monaco and Hilary L. Brunell, for plaintiff (George L. Schneider, Essex County Prosecutor, attorney).
Michael J. Marucci and Edward M. Neafsey for defendant (Joseph H. Rodriguez, Public Defender, attorney).
COCCHIA, J.S.C.
This formal written opinion is intended to embody and augment the oral decision previously rendered by the court in this matter. The issues addressed herein arise from certain pretrial motions brought by defendant Smith and the State in this case.
The salient facts are as follows. Smith is charged with first degree murder in the shooting death of 16-year old Ismael *581 Rodriquez. Smith was 17 at the time of the murder.[1] Jurisdiction over the case was waived by the Juvenile and Domestic Relations Court judge pursuant to N.J.S.A. 2A:4-48, also known as the waiver statute.[2] The waiver statute allows the Family Court, formerly the Juvenile and Domestic Relations Court, to relinquish jurisdiction over certain cases to the Law Division without the consent of the juvenile.
N.J.S.A. 2A:4-48 set out the standards to be considered by the Juvenile and Domestic Relations Court judge in determining whether to waive jurisdiction over Smith's case, and reads in pertinent part:
2A:4-48. Referral to other court without juvenile's consent

The juvenile and domestic relations court may, without the consent of the juvenile, waive jurisdiction over a case and refer that case to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing, that:
a. The juvenile was 14 years of age or older at the time of the delinquent act;
b. There is probable cause to believe that the juvenile committed a delinquent act which would constitute homicide ... and
c. The court is satisfied that adequate protection of the public requires waiver and is satisfied there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services and facilities available to the court.[3]
*582 A juvenile whose case has been transferred to the Law Division pursuant to the waiver statute is subject to indictment, trial, conviction and sentencing as an adult. See N.J.S.A. 2A:4A-28 (original version at N.J.S.A 2A:4-50).
Both the Superior Court, Appellate Division and the Supreme Court denied Smith's appeals of the waiver order. The grand jury returned an indictment charging him with purposeful or knowing murder by his own conduct, felony murder, first degree robbery and third degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:11-3a(1)-3a, (2), -3a(3), 2C:15-1 and 2C:39-5b. Thereafter, the prosecutor served Smith with notice of an aggravating factor N.J.S.A. 2C:11-3c(4)(g), which reads in relevant part: "The offense was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit robbery...." By serving Smith with notice of the aggravating factor he intended to prove in the sentencing proceeding, the prosecutor invoked the capital sentencing procedures of N.J.S.A. 2C:11-3c.
Smith moved to strike the application of N.J.S.A. 2C:11-3c, maintaining that he should not be exposed to the death penalty. He argued that the death penalty as applied to a juvenile violates the prohibition against cruel and unusual punishment contained in both the United States Constitution and the New Jersey Constitution. He further asserted that the New Jersey Legislature, in reenacting the death penalty in 1982, never intended or contemplated that capital punishment might be applied to a juvenile. Finally, Smith contended that the decision of the prosecutor to seek the death penalty in his particular *583 case was arbitrary, capricious and discriminatory, and therefore violated the Eighth Amendment's mandate against cruel and unusual punishment and Smith's equal protection rights under the Fourteenth Amendment.
In an endeavor to obtain information to substantiate his claim of arbitrary, capricious and discriminatory prosecution of his case as a capital cause, Smith served the prosecutor with a subpoena duces tecum, demanding that the prosecutor provide him with the guideline according to which homicide cases are selected for capital treatment and memoranda pertaining to the selection and rejection process. The State moved to quash Smith's subpoena duces tecum on the grounds that he had not demonstrated that the information sought was relevant and material to his claim of unconstitutional selectivity in the prosecutor's decision to treat his case as a capital case, and that much of the information demanded by Smith was confidential and not subject to subpoena.
It is these motions by Smith to strike application of N.J.S.A. 2C:11-3c, and by the State to quash Smith's subpoena duces tecum which comprise the substance of this opinion.

I
Smith contends that imposing the death penalty on persons under the age of 18 constitutes cruel and unusual punishment, and as such is forbidden by the Eighth Amendment of the United States Constitution, brought forward to the states under the Due Process Clause of the Fourteenth Amendment, and Article I, paragraph 12 of the New Jersey Constitution. The court, however, declines to resolve this issue because a decision as to whether the death penalty as applied to a juvenile is constitutionally impermissible would be, at this stage of these proceedings, premature and therefore improper.
As a fundamental proposition, courts should exercise restraint when asked to decide questions of constitutional import. "Trial courts are mandated to avoid decisions on constitutional *584 issues except when such decisions are imperative and inescapable." Tonsorial Inc. v. Union City, 115 N.J. Super. 33, 41 (Law Div. 1971); Ahto v. Weaver, 39 N.J. 418, 428 (1963). Furthermore, courts should not anticipate situations wherein application of a statute might be unconstitutional. State v. Hobbs, 90 N.J. Super. 146 (App.Div. 1966).
It is not essential for the court, at this relatively nascent stage of this case, to determine whether the United States Constitution and the New Jersey Constitution proscribe or permit capital punishment of juvenile offenders. The question is not yet ripe for resolution, and will not become so unless and until Smith is actually sentenced to death. It is possible that a reasonable jury, at the conclusion of the guilt phase of Smith's trial, might find him not guilty of any homicide charge or convict him of a lesser included offense for which the death penalty is not an authorized punishment. Similarly, even if Smith is convicted of purposeful or knowing murder by his own conduct, the jury might decide that the presence of one or more mitigating factors or the exercise of mercy makes imposition of the death penalty inappropriate. Thus, it is purely a matter of conjecture at this juncture whether Smith will in fact be convicted of first degree murder and sentenced to death. The court is disinclined to decide a constitutional question of the magnitude and sensitivity as the one raised here on the basis of a speculative outcome.
The Appellate Division dealt with the same issue in a like manner in an unpublished opinion, State of New Jersey in the Interest of D.B., No. A-353-84T5 (App.Div. Feb. 19, 1985). In that case, the juvenile defendant appealed from an order of the Family Part waiving jurisdiction to the Law Division where he was to be charged as an adult with the crimes of murder, armed robbery and burglary. One of the arguments advanced by the defendant in support of his appeal was that application of the capital punishment statute to a juvenile was unconstitutional. The State countered by claiming that any argument *585 concerning the death penalty was premature. The Appellate Division had this to say with regard to the timeliness of the defendant's challenge to the applicability of the statute:
Neither the United State Supreme Court nor our Supreme Court has held that the death penalty, as applied to a juvenile, violates constitutional standards. (The United States Supreme Court expressly avoided this issue in Eddings v. Oklahoma, 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982). The only bar to execution of juveniles in New Jersey is the waiver statute which prohibits waiver of juveniles under the age of 14. N.J.S.A. 2A:4A-26a(1).
... Whether defendant will ultimately be convicted and whether the death penalty will be imposed are merely speculations at this point.
Id., slip op. at 16-17. The Appellate Division refused to decide whether capital punishment of juveniles was or was not constitutional.
Given the similarly hypothetical status of Smith's conviction and sentence at this time, this court refrains from deciding the constitutional questions raised by Smith's motion to strike application of the death penalty provisions of N.J.S.A. 2C:11-3c.

II
Smith also challenges application of the capital punishment statute to his case on the ground that the Legislature never contemplated or intended that the death penalty could be applied to juveniles. He maintains that this conclusion is supported by considerations of statutory language, legislative history and societal attitudes.
Smith asserts that neither the waiver statute in effect when this case arose, N.J.S.A. 2A:4-48, nor the present waiver statute, N.J.S.A. 2A:4A-26, nor the capital punishment statute, N.J.S.A. 2C:11-3c, contains language indicating that the Legislature knew and intended that juveniles tried as adults could be exposed to the death penalty. He points out that the legislative history to the statutes in question, too, is silent on the subject of capital punishment of juveniles. Smith also relies on the fact that the former waiver statute, N.J.S.A. 2A:4-48, by operation of which his case was transferred to the Law Division, was passed prior to reenactment of the death penalty and at a time *586 when there was no capital punishment in New Jersey. He maintains that this further substantiates his claim that when the Legislature provided for adult treatment of certain juvenile offenders, it did not and could not have intended to expose juveniles to the death penalty. Finally, Smith contends that society's traditionally lenient treatment of minors additionally supports the conclusion that the Legislature never meant for persons under the age of 18 to be subject to capital punishment.
In addressing these contentions, the court begins by iterating certain established principles pertaining to judicial interference with legislative enactments. "Legislative enactments are presumed to be valid and the burden on the proponent of invalidity is a heavy one." Velmohos v. Maren Engineering Corp., 83 N.J. 282, 295 (1980); State v. Dunlap, 181 N.J. Super. 71, 74 (Law Div. 1981). "[T]he presumption is that the [L]egislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner. The articulation of the elements which furnish that essential intent need not appear in the statutory language." State v. Profaci, 56 N.J. 346, 349 (1970). The Legislature is also presumed to be thoroughly knowledgable of its own enactments when it adopts a new statute. State v. Alexander, 184 N.J. Super. 615, 622 (Law Div. 1981); State v. Gregorio, 186 N.J. Super. 138, 150 (Law Div. 1982). Furthermore, our Supreme Court has instructed that "[m]urder is the most heinous and vile offense proscribed by our criminal laws.... In dealing with this particularly egregious offense, great deference must be given to the legislative intent governing sentencing." State v. Serrone, 95 N.J. 23, 27 (1983).
The court is not satisfied that Smith has met his weighty burden of establishing that application of the death penalty to a juvenile defendant was an occurrence neither foreseen by, nor deliberate on the part of, the Legislature. While Smith maintains that the silence of the statutes and their legislative history demonstrate that capital punishment of juveniles is a statutory mishap brought about by legislative oversight, silence *587 alone is insufficient to overcome the strong presumptions of legislative awareness and statutory validity called into play by his contention. Although the former waiver statute, N.J.S.A. 2A:4-48, was passed prior to the Legislature's reenactment of the death penalty, the Legislature is presumed to have been fully cognizant of the existence and operation of the waiver statute when it passed the capital punishment statute. If it had been the wish of the Legislature to insulate juveniles affected by the waiver statutes from the death penalty provisions of N.J.S.A. 2C:11-3c, it could easily have done so by including appropriate language. Alexander, supra, 184 N.J. Super. at 623. The natural and proper inference to be drawn from the absence of any such language in either the capital punishment statute or the contemporaneously enacted waiver statute[4] is that the Legislature never intended to bar application of the death penalty to juvenile criminals.
A reading of the capital punishment statute itself further persuades the court that the Legislature did not mean to exclude juveniles tried and convicted as adults from the statute's ambit. N.J.S.A. 2C:11-3c sets forth eight aggravating and eight mitigating factors. In order for a defendant convicted of purposeful or knowing murder by his own conduct to be sentenced to death, the State must first prove beyond a reasonable doubt the existence of at least one of the aggravating factors enumerated in N.J.S.A. 2C:11-3c(4), and such aggravating factor or factors must be found not to be outweighed by any of the mitigating factors in N.J.S.A. 2C:11-3c(5).
Expressly included among the mitigating factors is "the age of the defendant at the time of the murder." N.J.S.A. 2C:11-3c(5)(c). Thus, the Legislature, in making the age of a defendant *588 a potentially mitigating circumstance, evidently intended that age itself not be an absolute bar to imposition of the death penalty. The Legislature instead apparently chose to leave it for the jury to decide at the time of sentencing whether a defendant's age is indeed a mitigating factor.
Also, the last of the mitigating factors set forth in N.J.S.A. 2C:11-3c(5) allows the sentencing authority to consider "any other factor which is relevant to the defendant's character." N.J.S.A. 2C:11-3c(5)(h). The term "`character' within the context of N.J.S.A. 2C:11-3c(5)(h) can and should embrace those individual qualities that distinguish a particular person." State v. Davis, 96 N.J. 611, 618 (1984). This "catch-all" factor would allow a jury to consider, apart from and in addition to a juvenile defendant's numerical age at the time of commission of the homicide, any characteristics he might possess which might be the by-products of youth, such as immaturity, impulsiveness and potential for reform.
The inclusion of these two mitigating factors, one which expressly permits consideration of age and the other which allows for consideration of the characteristics of youth, refutes Smith's contention that the Legislature never considered or intended that New Jersey's capital punishment statute could be applied to juveniles.
Finally, the court rejects Smith's assertion that society does not favor capital punishment of juvenile offenders. The disconcerting statistics regarding youth involvement in violent crime were recently recognized by our Supreme Court in State v. Des Marets, 92 N.J. 62, 73-74 (1983). Moreover, capital punishment of certain criminals, notwithstanding their age, serves society's legitimate and substantial interests in deterrence and retribution. Trimble v. State, 300 Md. 387, 416-29 478 A.2d 1143, 1158-64 (Ct.App. 1984). In Trimble, the Maryland Court of Appeals held that capital punishment of persons under the age of 18 was constitutional. It had the following to say with regard to society's interests in deterrence and retribution:

*589 Society's "moral outrage" may be tempered somewhat by the youthful age of the perpetrator; hence the alternative "response" of treatment in the juvenile system. Nevertheless, society's interest in retribution is by no means inapplicable in juvenile cases: In extreme cases, the benign goals of the juvenile system are subordinated to the more broad-based and immediate interest in retribution. In short, a particularly heinous act can take the juvenile outside of the protective umbrella of the juvenile system.
... Imposition of the death penalty in this instance will send a message to others contemplating similar acts that society will respond harshly to their actions. In short, we believe that seventeen-year-old youths can be deterred.... [Id. at 428-29, 478 A.2d at 1163-64]
Smith has not met his burden of demonstrating that the New Jersey Legislature did not intend for the death penalty to be applied to juveniles. The court will not substitute its judgment for that of the elected representatives whose task it is to see that society's interests in deterring and avenging violent criminal acts are served by our criminal laws. Therefore, the court refuses to strike application of N.J.S.A. 2C:11-3c on grounds of legislative invalidity.

III.
Smith contends that even if application of New Jersey's capital punishment statute to a juvenile is constitutionally and legislatively valid, it nevertheless should not be applied in this case because the decision of the prosecutor to seek the death penalty is an arbitrary, capricious and discriminatory abuse of discretion. To obtain information to substantiate this contention, Smith served a subpoena duces tecum upon the prosecution. In his subpoena, Smith demanded that the prosecutor make available to him (1) the guideline used by the Essex County Prosecutor's office in determining the selection of capital cases; (2) all memoranda relating to the selection of capital cases in Essex County; (3) all memoranda relating to decisions not to select certain homicide cases as capital cases; and (4) all memoranda relating to the capital selection or rejection process in approximately 60 other cases. The State moved to quash Smith's subpoena duces tecum, maintaining that Smith had not shown that the information he demanded was relevant and *590 material to his claim of arbitrary, capricious and discriminatory prosecution of his case as a capital case. The State also objected to Smith's subpoena on the grounds that it was over-broad in scope and that much of the information sought was privileged in nature.
Selective prosecution, if founded on improper motives or grounds, can violate the Equal Protection Clause of the Fourteenth Amendment. U.S. v. Kahl, 583 F.2d 1351, 1353 (5 Cir.1978). "In order to make out a claim of selective prosecution the defendant must show: First, that others similarly situated generally have not been prosecuted; and second, that the Government's prosecution of him is selective, invidious, in bad faith or based on impermissible considerations such as race, religion or his exercise of constitutional rights." Ibid.; accord U.S. v. Catlett, 584 F.2d 864, 866 (8 Cir.1978). Thus, the burden is on Smith to demonstrate that he has been singled out for capital prosecution while similarly situated defendants have not been so prosecuted, and that prosecution of his case as a capital case is selective, invidious, in bad faith or based on constitutionally untenable grounds.
Infliction of a severe punishment such as the death penalty can also constitute cruel and unusual punishment within the meaning of the Eighth Amendment as applied to the states by the Due Process Clause of the Fourteenth Amendment if it is arbitrarily or capriciously administered. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The death penalty inflicted on a defendant runs afoul of the Eighth and Fourteenth Amendments "if it discriminates against him by reason of his race, religion, wealth, social position or class, or if it is imposed under a procedure that gives room for the play of such prejudices." Id. at 242, 92 S.Ct. at 2728. (Douglas, J., concurring).
One telling indicator of possible arbitrariness in the administration of a severe punishment is the frequency with which it is actually applied as compared to the number of cases in which it *591 might properly be imposed. When a harsh punishment such as the death penalty is imposed in the great majority of cases in which it is an authorized punishment, the risk of arbitrary application is minimal; however, if "the infliction of a severe punishment is something different from that which is generally done in such cases, ... there is a substantial likelihood that the State, contrary to the requirements of regularity and fairness embodied in the [Eighth Amendment], is inflicting the punishment arbitrarily." Id. at 276, 92 S.Ct. at 2745 (Brennan, J., concurring; citations omitted).
In support of his claims of selective and arbitrary prosecution of his case as a capital case and his subpoena duces tecum, Smith brings to the court's attention 15 other recent homicide indictments. Like the indictment under which Smith is charged, each of these indictments charges the defendant with purposeful or knowing murder by his or her own conduct. Each also includes a count charging that the victim of the murder was also the victim of a robbery. In each of these cases, it was factually plausible for the prosecutor to seek the death penalty. Unlike Smith, however, none of these 15 other defendants was served with notice of aggravating factor N.J.S.A. 2C:11-3c(4)(g). Thus, the prosecutor made the decision to treat Smith's case as a capital case, but declined to seek the death penalty against similarly situated defendants.
The court is satisfied that Smith has amply demonstrated that he has been singled out for capital prosecution based upon aggravating factor N.J.S.A. 2C:11-3c(4)(g), whereas others who have been charged with substantially the same conduct were not served with notice of that or any other aggravating factor. The court regards this disparity in the prosecution of homicide cases to be disturbing, especially in view of the fact that it has no notion of criteria and procedure according to which the prosecutor decides whether to seek the death penalty in a particular case. For these reasons, the court is not quashing the first demand set forth in Smith's subpoena duces *592 tecum, wherein he asks the Essex County Prosecutor's Office to disclose the guideline by which it selects capital cases.
In so deciding, the court is mindful of a number of principles. It recognizes that a prosecutor is invested with broad discretionary powers. State v. Laws, 51 N.J. 494, 510-11 (1968), cert. den. 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Mitchell, 164 N.J. Super. 198, 201 (App.Div. 1978). This broad grant of power includes the decision whether to prosecute, State v. Hermann, 80 N.J. 122 (1979), as well as the decision as to what charges to bring against a defendant. U.S. v. Lippi, 435 F. Supp. 808 (D.C.N.J. 1977). It is within his discretion for a prosecutor to decide not to seek the death penalty. State v. Conyers, 58 N.J. 123, 146 (1971).
As a general proposition, the conduct of a prosecutor is presumed to be valid. State v. McCrary, 97 N.J. 132, 142 (1984), and the court acknowledges that prosecutorial decisions are to be accorded judicial deference. Mitchell, supra, 164 N.J. Super. at 201. Nevertheless, the actions of the prosecutor are not altogether immune from judicial oversight. McCrary, supra, 97 N.J. at 140-41; State v. Abbati, 195 N.J. Super. 218, 221 (App.Div. 1984). In appropriate circumstances, prosecutorial decisions may be judicially reviewed for arbitrariness or abuse. In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 516 (1974); State v. Leonardis, 73 N.J. 360, 376 (1977). Indeed, in certain cases a court may have an obligation to undertake such a review. McCrary, supra, 97 N.J. at 144; Leonardis, supra, 73 N.J. at 375.
Nowhere is judicial intrusion into the realm of prosecutorial discretion more appropriately exercised or likely to be necessary than in capital criminal proceedings. McCrary, supra, 97 N.J. at 141. By serving a defendant in a homicide case with notice of the aggravating factor or factors he intends to prove in the penalty phase of trial, the prosecutor transforms the proceeding into a capital case. The consequences of this exercise of prosecutorial discretion are tremendous in significance *593 and scope. The prosecutor's notice triggers the death qualification of jurors and a separate sentencing proceeding, generates an increase in pretrial and presentencing investigations and motions, exacts great investments of administrative and judicial time and resources, and brings the threat of death over the head of an accused. Ibid. Because of the momentous effects, it is essential to assure that the prosecutor's decision to seek the death penalty is free of any arbitrariness or capriciousness.
The prosecutor argues that so long as there was an adequate factual basis for serving Smith with notice of the aggravating factor to be proved in the capital sentencing proceeding, he cannot be said to have acted arbitrarily or capriciously in selecting Smith's case for capital treatment. This argument, however, confuses arbitrary and capricious prosecution with groundless prosecution. The issue of factually insufficient noticing of aggravating factors was recently addressed by the Supreme Court in McCrary. In McCrary, the Court authorized pretrial judicial review of the adequacy of the evidence supporting the aggravating factors which the State proposes to prove at a capital sentencing proceeding. McCrary, supra, 97 N.J. at 140. The evil sought to be avoided by the court in McCrary was the actuation of the death penalty provisions of N.J.S.A. 2C:11-3c(1) and its attendant consequences without some basis in fact. McCrary, supra, 97 N.J. at 141.
The peril the court seeks to avert here is the arbitrary selection by the prosecutor of death penalty cases. "`Arbitrary' means depending on will or discretion, that is not governed by any fixed rules or standards." Canada Dry Ginger Ale, Inc. v. F & A Distrib. Co., 28 N.J. 444, 456 (1958); emphasis supplied. To say that one has acted arbitrarily is to say that he acted in a manner "not governed by any fixed rule" or "exercised according to one's own will or caprice and therefore conveying a notion of a tendency to abuse possession of power." State v. Then, 114 N.J.L. 413, 418-19 (Sup.Ct. 1935). *594 Thus, even though the prosecutor might have had an adequate factual basis for serving Smith with notice of an aggravating factor N.J.S.A. 2C:11-3c(4)(g), this does not in and of itself necessarily protect the prosecutor's decision to seek the death penalty in Smith's case from the stigma of arbitrariness.
Even now, almost three years after reenactment of the death penalty, the guidelines by which the prosecutor determines whether to proceed with a homicide case as a capital or noncapital cause remains obscure. Indeed, in oral argument in support of the motion to quash Smith's subpoena duces tecum, the attorney for the State admitted that she had no notion as to how the Essex County Prosecutor's Office chooses homicide cases for capital treatment. How then is a defendant who has been served with notice of an aggravating factor pursuant to N.J.S.A. 2C:11-3c(2) to meet his burden of demonstrating that the decision of the prosecutor to seek the death penalty is arbitrary or otherwise constitutes an abuse of discretion where the defendant has no comprehension of the criteria and procedure by which that vital decision is made? A court is confronted with a similar obstacle when asked to review the prosecutor's decision for arbitrariness or abuse. The defendant to whom the prosecutor owes a duty of fairness; the public on whose behalf the prosecutor carries out the responsibilities of his office; and the court, which must be sufficiently informed about the decision-making process so as to be able to ensure that it is free of any randomness, vagary or discrimination, are all entitled to some understanding of how the prosecutor selects cases for capital treatment.
Because the need to assure that the prosecutor has acted conscientiously and within his discretionary powers is never more acute than it is in a death penalty case, the court is ordering that the prosecutor submit in writing a statement setting forth the criteria and procedure by which the Essex County Prosecutor's office selects homicide cases for capital prosecution.
*595 The court does not go so far at this point as to provide that in every capital case the prosecutor can or should be required to explain why and how the determination was made to seek the death penalty against that particular defendant. Nor does the court now suggest that the prosecutor might be required to justify his decision to prosecute a given homicide case as a capital case when, in factually similar cases, he did not serve notice of an aggravating factor. Instead, the inquiry contemplated by the court is general in nature and limited in scope. Nevertheless, it serves an important function in that it will dispel some of the reconditeness that thus far has attended the decision-making process by which capital cases are chosen.
In view of the narrowness of the court's decision, it need not now address the issues of overbreadth and confidentiality raised by the State with regard to its motion to quash Smith's subpoena duces tecum. The court quashes the remainder of Smith's subpoena pending review of the prosecutor's statement of capital case selection guidelines.
NOTES
[1] Smith's date of birth is May 24, 1966. Ismael Rodriquez was killed on August 28, 1983.
[2] N.J.S.A. 2A:4-48, under which the Juvenile and Domestic Relations Court waived jurisdiction over this case has since been repealed by L. 1982, c. 77, § 33, eff. Dec. 31, 1983. The current waiver statute is set out at N.J.S.A. 2A:4A-26.
[3] The present waiver statute makes substantial changes in the procedure by which jurisdiction over a juvenile matter is waived. Primary among these changes is that under the new statute the burden is on the prosecution to establish that the alleged delinquent act would constitute a serious offense such as criminal homicide, first degree robbery or arson. N.J.S.A. 2A:4A-26a(2); New Jersey Code of Juvenile Justice, L. 1982, c. 77, § 1 (Senate Judiciary Committee Statement). Once the prosecution has made such a showing, waiver takes place. N.J.S.A. 2A:4A-26a. However, if the juvenile can demonstrate that the probability of his rehabilitation prior to his reaching the age of 19 substantially outweighs the reasons for waiver, waiver is denied. N.J.S.A. 2A:4A-26a(3).

For the purposes of the analysis herein, it is the effect of waiver and not the procedure by which waiver is accomplished that is significant. Therefore, the distinctions between the former and present waiver statutes are of minimal relevance.
[4] The death penalty was reenacted by L. 1982, c. 111 § 1, eff. Aug. 6, 1982. The current waiver statute, N.J.S.A. 2A:4A-26, was enacted by L. 1982, c. 77, § 7, eff. Dec. 31, 1983. It is difficult to accept the premise that two such significant laws could come into existence in the same year without the Legislature realizing the consequences of their potential interplay.