608 A.2d 880

IN THE MATTER OF ADVISORY COMMITTEE ON
PROFESSIONAL ETHICS OPINION 621.

Argued January 14, 1991—Decided June 30, 1992.

578

*Frederick C. Mezey* argued the cause for appellant Alan B. Zublatt (*Mezey, Mezey, Goldman & Zublatt,* attorneys; *Frederick C. Mezey* and *Steven M. Hambro,* on the briefs).

*Marci Levin Hochman,* Assistant Legislative Counsel, argued the cause for appellant Office of Legislative Services (*Albert Porroni,* Legislative Counsel, attorney).

*Leon J. Sokol* argued the cause for appellants New Jersey Senate and the New Jersey General Assembly (*Greenstone, Sokol, Behot & Fiorenzo* and *Dowd and Reilly*, attorneys).

*Michael R. Clancy,* Assistant Attorney General, argued the cause for appellant Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

*Kenneth M. Van Deventer* argued the cause for respondent, Advisory Committee on Professional Ethics (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Everett M. Scherer,* of counsel; *Kenneth M. Van Deventer* and *Andrew M. Lankler,* on the briefs).

The opinion of the Court was delivered by

WILENTZ, C.J.

The issues raised in this case concern the proper ethics restrictions on the private practice of lawyers who are part-time legislative aides. A legislative aide is someone hired by a legislator to assist him or her in whatever way the legislator deems appropriate. Some of the aides are lawyers, some are not. Apparently, almost all are part-time. Some receive no compensation, while some are paid a salary determined by the legislator; some receive only reimbursement for expenses. Any monies that are paid, however, come from the State.

Under the Conflicts of Interest law, *N.J.S.A.* 52:13D–12 to – 27 (the Act), the legislative aides are considered "special State officers or employees" and are subject to certain restrictions on their outside employment, which undoubtedly provides their major source of income. Those restrictions are significant mostly for those part-time legislative aides who are lawyers.

The purpose of the Act is to maintain the public's confidence in government and its officers and employees. In pursuit of that goal, the Act's restrictions, applicable to all State employees, not just legislative aides or other special State employees, attempt to ensure that public servants do not, either in fact or in appearance, use their official positions to earn money unfair-

ly, especially at the expense of the public. Those restrictions, in the case of lawyers, are in addition to whatever restrictions apply by virtue of our Rules of Professional Conduct (RPC), applicable to all attorneys.

■ We hold that under the Act and our RPCs the following restrictions apply to the private legal practice of lawyers who are part-time legislative aides: 1) they may not represent a private party in any way before the Legislature or either house thereof or before any agency of the Legislature; 2) they may not represent a private party in any way before *any* agency of the State, whether in the legislative, executive, or judicial branch of government, in connection with any matter for which they have or have had substantial responsibility as a legislative aide; and 3) they may not represent a private party in any way before *any* agency of State government in any of its branches if such representation would create an appearance of impropriety. Given the unpredictable nature of the facts that can occur in matters of this kind, there may be situations not covered by the foregoing that trigger rules of ethical conduct that impose other restrictions in particular cases.

We also hold that given the facts of record in this matter, the appellant Zublatt's representation of a private party before any agency of State government outside the Legislature would not create an appearance of impropriety. Furthermore, while the record before us is insufficient to allow us to be certain on this point, it indicates that in cases involving a relatively minimal involvement of legislative aides in the legislative process, the "appearance of impropriety" restriction will ordinarily not apply. As noted later, however, the determination of whether any representation of a private party before executive agencies would create an appearance of impropriety is very much dependent on the facts of the case. *Reardon v. Marlayne, Inc.*, 83 *N.J.* 460, 469, 416 *A.*2d 852 (1980). Consequently, there will undoubtedly be some cases in which such appearance of impro-

priety would exist and such representation by a lawyer/legislative aide would be improper.

## I

Alan Zublatt, an attorney engaged in private practice, is a partner in the firm of Mezey, Mezey, Goldman & Zublatt. His firm's practice consists mainly of commercial land-use and zoning matters. Regular appearances before governmental bodies are therefore necessary, including but not limited to municipal and county planning boards and boards of adjustment. Occasional appearances are also made before State agencies and administrative law judges. Finally, the firm is engaged in litigation in both State and federal courts. *Opinion No. 621*, 122 *N.J.L.J.* 1406 (1988).

Zublatt was offered the position of legislative aide by an Assemblyman. His duties, as he understood them, would have included "analysis of proposed legislation, periodic Assembly appearances, conferences with constituent lobbyists and public speaking engagements on behalf of the Assemblyman." *Ibid.* Generally aware of the ethics restrictions on private practice that might result from accepting the position, he asked the Advisory Committee on Professional Ethics (ACPE), pursuant to *Rule* 1:19–2 for an advisory opinion on the matter. The inquiry consisted of three specific questions:

A) Will the candidate's acceptance impose any ethical prohibitions upon his personal ability to practice, appear before and represent private clients before State agencies and/or county and/or municipal bodies?

B) Will the assignment preclude the firm from engaging in practice within the jurisdiction of the civil courts, State and Federal, and/or before Municipal, Compensation, or Administrative Law Courts, and/or State, County or Municipal authorities?

C) Assuming arguendo that formal appearances before State agencies would be proscribed, would correspondence and communications with these entities be permitted? [*Ibid.*]

The ACPE's opinion concluded that Mr. Zublatt could neither represent private parties before any State agency in *any* of the branches of government nor communicate with such agencies

on the clients' behalf. As clarified, the opinion restricts him from appearances in court only when the State is actually an adverse party in the litigation. *Supplement to Opinion No. 621,* 124 *N.J.L.J.* 1450, 1472 (1989). The restriction extends not simply to "appearances" before such agencies but to applications of all kind, be it for permits, waivers, and rulings. *Opinion No. 621, supra,* 122 *N.J.L.J.* at 1420. In essence, he is prohibited from having anything to do with any of these agencies on behalf of his clients.[1]

The ACPE stayed the effect of its opinion pending disposition of the issue by this Court.

Not only did Zublatt seek Court review of the ACPE opinion pursuant to *Rule* 1:19-8, but so did the State, the Senate, the Assembly, and the Office of Legislative Services, acting on behalf of the Legislature and the Joint Legislative Committee on Ethical Standards. We granted the petitions of all these parties, in effect waiving the requirement of *Rule* 1:19-8(a) that restricts such appeal to "an aggrieved member of the bar, bar association or ethics committee."

The concern of the other branches of government, and a major theme in these proceedings, is the asserted likelihood

---

[1]While the ACPE opinion did not explicitly address each of the three questions, the answer to question A appears to be that Zublatt is prohibited from representing private clients before State agencies (the ACPE did not address the issue of appearances before county and/or municipal bodies, nor has this litigation dealt with it, but the Act expressly excludes those appearances from coverage). Question B was answered with the conclusion that Zublatt is prohibited from representing clients in court only when the State is actually an adverse party (but, if the ACPE is correct, he may not appear at all before an Administrative Law Judge (*see Wood v. Department of Community Affairs,* 243 *N.J.Super.* 187, 195–97, 578 *A.*2d 1257 (App.Div.1990)), and may not represent a client in connection with any State authority, defined in the Act as a "State agency." *N.J.S.A.* 52:13D–13a. Because the ACPE concluded that representation was prohibited, obviously correspondence and communications with such entities is also prohibited and Question C was therefore answered also in the negative. Neither *Opinion No. 621* nor this decision touches on the question of the propriety of such communications and correspondence when they do not concern the representation of clients.

that unless clarified or modified, *Opinion No. 621* represents the death-knell not only of part-time lawyer/legislative aides but of all lawyers who serve part-time in government for either the legislative or executive branches. It is not clear how many such lawyers are affected, but the number has been suggested as running into the hundreds. Judged by the intensity of the attack on *Opinion No. 621*, both the Legislature and the Executive believe it would cause an irreparable loss of public service to the State.

## II

The Act is a post-Watergate enactment designed to maintain public confidence in government by placing restrictions on self-dealing between public officials and government agencies. It is addressed not only to situations of actual conflict of interest and divided loyalty, but also to their appearance. *N.J.S.A.* 52:13D–12. The Act was substantially modified to address ethical concerns related to the casino gaming industry. See *L.*1981, *c.* 142 and *L.*1980, *c.* 79. In many respects it mirrors both the restrictions and the principles of attorney ethics.

The Act divides public officials into three groups: State officers and employees, special State officers and employees, and legislators. *N.J.S.A.* 52:13D–13. State officers and employees are defined by the Act as follows:

"State officer or employee" means any person, other than a special State officer or employee (1) holding an office or employment in a State agency, excluding an interstate agency, other than a member of the Legislature or (2) appointed as a New Jersey member to an interstate agency. [*N.J.S.A.* 52:13D–13b.]

Generally speaking, this definition covers all full-time salaried employees of the State in the legislative and executive branches. The definition of special State officers and employees is:

"Special State officer or employee" means (1) any person holding an office or employment in a State agency, excluding an interstate agency, for which office or employment no compensation is authorized or provided by law, or no compensation other than a sum in reimbursement of expenses, whether payable per diem or per annum, is authorized or provided by law; (2) any person, not a member of the Legislature, holding a part-time elective or appointive office or

employment in a State agency, excluding an interstate agency, or (3) any person appointed as a New Jersey member to an interstate agency the duties of which membership are not full-time. [*N.J.S.A.* 52:13D–13e.]

This definition covers all part-time employees, including not only such positions as part-time legislative aides but also, and there is no dispute about this, all of the many people who serve on governmental boards and commissions without any pay at all, or, at most, only *per diem* compensation or reimbursement of expenses. There are a multitude of such boards and commissions, created by the Legislature, by the Executive, by law, or otherwise, whose membership is often made up of volunteer, public-spirited citizens. They are all, under this definition, "special State officers or employees." [2]

Restrictions on State officers and employees are the greatest. Those on special State officers and employees and on legislators are somewhat diminished, apparently because of the part-time nature of the latter's service. *N.J.S.A.* 52:13D–16a prohibits special State officers from representing private clients only before the board, agency, commission or other part of government in which they are employed or hold office. The restriction applies not only to the special State employee, but, if he or she is a lawyer with a law firm, to the law firm and its partners and associates as well.

The restriction on other State officers and employees (*i.e.,* those who are not "special State officers and employees") are broader. *N.J.S.A.* 52:13D–16b prohibits such people from representing private clients "before *any* State agency" (emphasis added), obviously, including all of the agencies, boards, and

---

[2]The conclusion that such volunteers are "special State officers or employees" is supported by the Act's definitions. The category "special State officer or employee" includes any person "holding an office or employment in a State agency for which office or employment no compensation is authorized or provided by law, or no compensation other than a sum in reimbursement of expenses * * * is authorized or provided by law." *N.J.S.A.* 52:13D–13e. "State agency" itself includes "any division, board, bureau, office, commission or other instrumentality" of either the executive or legislative branches. *N.J.S.A.* 52:13D–13e.

commissions, in both the legislative and executive branch, regardless of either the scope or nature of the person's duties or the particular section of government in which he or she works. Again, the restriction applies to the lawyer's firm as well as to all its partners and associates. Under *N.J.S.A.* 52:13D–16c, however, certain kinds of representation are explicitly allowed, some of which are arguably otherwise prohibited by other provisions of the Act: handling a client's transfer inheritance or other estate-tax matter; representing a private client in court, in workers' compensation proceedings, or in matters before the Division on Civil Rights, the New Jersey State Board of Mediation, or the New Jersey Public Employment Relations Commission; and representing a client before any State agency when the client is a county, municipality, or a school district. This last exception, however, does not apply if the State is an adverse party or if the agency before which the proceedings are pending is one in which the employee works. *N.J.S.A.* 52:13D–16c(9). These "exceptions" seem to be totally irrelevant to a special State officer or employee because none of the explicitly permitted appearances would otherwise be prohibited for such an employee.[3]

The distinction between full- and part-time employees is probably less a function of their relative importance than it is a recognition of the fact that unlike a full-time employee, a part-time one must look outside government for his or her primary source of income and would likely refuse to serve as a part-time employee if doing so could jeopardize that primary source of

---

[3]The special State officer or employee can represent any party, private or public, before agencies other than the one in which he or she is employed. Some of the parties have suggested, however, that subsection 16c(9) restricts special State employees. The limitation on that subsection was obviously inserted to avoid the possible appearance of impropriety that occurs when a legislator or full-time State employee representing a county, municipality, or school district appears before a State agency and the State itself is an adverse party; that the Legislature intended, by that "permission" to limit, rather than expand, representation by special State employees seems unlikely.

income. *Cf. Knight v. City of Margate,* 86 *N.J.* 374, 396, 431 A.2d 833 (1981) (recognizing that unlike full-time judges, part-time municipal court judges are permitted to practice law and therefore may be subject to more permissive ethical restrictions on outside employment).

The Act provides for the adoption of a Code of Ethics by the various State agencies and by the Legislature itself, addressed to the needs and problems of the agency to which the Code applies. *N.J.S.A.* 52:13D–23. Such a Code is meant "to govern and guide the conduct" of all of those affected by the Act, and must conform "to the general standards" set forth in the Act. *Ibid.*

The Legislative Code of Ethics (Legislative Code), temporarily adopted by the Legislature each year, while generally tracking the Act, has increased the restrictions on special State officers and employees in one respect. *See Legislative Code of Ethics,* § 3:3, *reprinted in State of New Jersey, Manual of the Legislature of New Jersey 1992* at 388. Section 3:3 of the Legislative Code expands the agencies before which a special State officer of the Legislature may not appear to include all of those "in the Legislative Branch." *Id.* at 401. Section 3:5 also narrows the Act's section 16 exceptions insofar as State officers or employees are concerned by prohibiting their appearance in court when the State or a State agency is an adverse party. This increased restriction, however, is apparently not applicable to legislators. *Ibid.*

Violation of the various codes applicable to the different agencies within the executive branch and violations of the Legislative Code may result in the removal or discipline of those covered by the Act, presumably including legislators. Such action may not be taken, however, without the approval of either the Executive Commission on Ethical Standards, in the case of executive employees, or the Joint Legislative Committee on Ethical Standards, in the case of those in the legislative branch. In addition, the Legislative Code includes provisions

for the issuance, on request, of advisory opinions by the Joint Legislative Committee on Ethical Standards, which is also "vested" with the "administration and enforcement" of both the Code and the Act. Legislative Code of Ethics § 4:1.

*N.J.S.A.* 52:13D–23(e) sets forth "general standards" to which any relevant Code of Ethics must conform, including the following:

(3) No State officer or employee or special State officer or employee should use or attempt to use his official position to secure unwarranted privileges or advantages for himself or others.

 \* \* \* \* \* \* \* \*

(7) No State officer or employee or special State officer or employee should knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State officer or employee or special State officer or employee.

Further, the statute requires that in its application to legislators the Code of Ethics conform to the standard set forth in the Act "as nearly as may be possible." *N.J.S.A.* 52:13D–23(f).

The Legislative Code, therefore, substantially mirrors, and somewhat expands, the restrictions of the Act. Presumably, the various ethical codes applicable to the executive do the same.

Before the ACPE had released *Opinion No. 621,* Zublatt, pursuant to the provisions of the Legislative Code, sought an advisory opinion from the Joint Legislative Committee on Ethical Standards. *Opinion No. 621, supra,* 122 *N.J.L.J.* at 1420. Although we do not have the letter of inquiry, the Legislative Committee stated that appellant's general inquiry was whether he "could continue to represent private clients before State agencies." *Ibid.* The Committee's advisory opinion limits Zublatt only in connection with representation before agencies of the legislative branch. It notes that his permitted representation of private parties before all of the agencies in the executive or judicial branches is authorized "even where the State is an adverse party." *Ibid.*

That advisory opinion stands in stark contrast to *Opinion No. 621.* The former would allow appearances by special State officers or employees before State agencies, except those attached to the Legislature, without any restriction; the latter would prohibit such appearances completely.

### III

Initially it was the position of some of the appellants before us (but never the position of the State) that the interpretation and enforcement of the Act was vested solely in the Joint Committee, and that it was beyond the power of this Court, even given our power to regulate the conduct of attorneys, to impose restrictions on part-time lawyer/legislative aides that went beyond either the Act or the Legislative Code. However, by the conclusion of oral argument, it was clear that no one doubted the power of this Court in that regard.

While we do not purport to address every conceivable situation that might arise in the future, it is safe to say that generally, almost without exception, no branch of government has the power to authorize, either explicitly or implicitly, conduct by attorneys that violates the ethical standards imposed by the judiciary. It may very well be that our application of those standards will vary in certain situations because of their adverse impact on governmental functions—precisely the issue before us. Appellants allege, for instance, that if judicial ethics prohibit part-time legislative aides who are attorneys from engaging in certain conduct beyond the prohibitions of the Act itself, the State will lose the services of most of these aides, as well as those of many lawyers on executive and legislative boards and commissions. That consequence must, and does, give us pause in our application of the judiciary's ethical standards in this matter.

The point here, however, is that if the relaxation or exemption of our ethical standards is granted on the basis of comity, on the basis of consideration of the interests of the

other branches of government, on the basis, ultimately, of an evaluation of the public interest, it will be granted only by this Court. Neither the Legislature nor the Executive has any power to overrule attorney ethical standards promulgated by this Court. *In re Genser*, 15 *N.J.* 600, 607, 105 *A.*2d 829 (1954). In this regard, we reject the contention that the establishment of ethical standards for a lawyer/government employee is uniquely a matter for the Legislature. It may be true that the Legislature is normally the proper branch for establishing minimal ethical tenets for employees (and officeholders) of the legislative branch. *See Schear v. City of Elizabeth*, 41 *N.J.* 321, 325, 196 *A.*2d 774 (1964) (Legislature is proper branch for deciding when simultaneous service in two elected positions creates an ethics violation). However, when the employee or officeholder is a lawyer, the Legislature's ethical mandate becomes a floor, not a ceiling. Ultimately, it is the Court that establishes the ethical standards to which an attorney is held, and neither the Legislature nor the Executive can diminish them. *In re Genser, supra*, 15 *N.J.* at 607, 105 *A.*2d 829; *see also In re Opinion No. 415*, 81 *N.J.* 318, 324–25, 407 *A.*2d 1197 (1979) (explaining that attorneys holding government office held to higher ethical standard under Court Rules than under statutes).

We do not interpret the Legislative Code, to the extent that it vests in the Joint Legislative Committee the power to issue advisory opinions along with the power to administer and enforce the Act, to conflict with the foregoing principle. Furthermore, we readily agree that generally the interpretation, administration, and enforcement of the Act and the Legislative Code, insofar as they apply to non-lawyers, is vested in the Executive and the Legislature. Nonetheless, there may be situations in which judicial determination is essential. *See, e.g., State v. Gregorio*, 186 *N.J.Super.* 138, 155, 451 *A.*2d 980 (Law Div.1982) (declaring well settled proposition that "rules adopted by the Legislature are not reviewable by the judiciary *except* upon constitutional grounds") (emphasis added). To whatever extent, however, exclusivity of jurisdiction may apply to the

application of the Act and the Legislative Code, it cannot and does not have the effect of ousting the Judiciary from its exclusive jurisdiction over the practice of law or the regulation and discipline of attorneys.

## IV

The ethical principles governing the conduct of attorneys in government service and their application are numerous, complex, and as varied as the many situations in which the propriety of the conduct of public servants is questioned. We do not purport to cover all of them. Indeed, one of the problems in this proceeding, touching all aspects of our ruling, is the generality of the questions put to us. We are asked by appellant to tell him what he may do and what he may not do, and in certain ways we are able to answer. But to the extent that the question asks us to list every restriction that may apply to him because he is a lawyer, the answer is either impossible to find or not very helpful. The general answer, of course, is that he may not do anything that violates the ethical standards applicable to all attorneys, subject also to whatever additional restrictions are imposed by the Act. All we attempt to do here is set forth those ethical principles and their most obvious applications, without implying that there may not be others in certain situations.

The RPCs that are most obviously applicable to attorneys who are part-time legislative aides ("special State officers and employees") are *RPC* 1.7 and *RPC* 1.11. The former covers conflicts of interest in general. Although not directly applicable to legislative aides, since the State is not their client and "multiple representation" is therefore not involved, *RPC* 1.7(c)(2) is relevant to the extent that it reemphasizes that
in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

This RPC is also of some import, by analogy, through its prohibition of representation of a client "if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests * * *." *RPC* 1.7(b). Although both of these sections contemplate damage to one or the other of the two clients, we believe that in most cases they would be applicable when the damage is to the State, even though it is not a client.

More relevant, perhaps, is *RPC* 1.11. It addresses private practice by a former government attorney and sets forth the limitations on that practice because of the prior public employment. Because the Rules of Professional Conduct do not focus on the problems of part-time public employees who simultaneously practice law, there is no specific Rule addressed to that situation. It seems obvious, however, that whatever restrictions apply to "successive representation" must also apply to simultaneous representation. It is unlikely that that which is prohibited to a lawyer because he or she was formerly a public employee is permissible while he or she is a public employee.

The most applicable parts of *RPC* 1.11 are subsection (a), which prohibits representation of a private client in a matter that the lawyer, as a public employee, had (or here "has") substantial responsibility; and subsection (b), which prohibits representation of a private client if "[a]n appearance of impropriety may arise * * * in connection with a matter that relates to the lawyer's former employment as a public officer or employee even if the lawyer did not personally and substantially participate in it, have actual knowledge of it, or substantial responsibility for it." Under the latter subsection a "wall" may be built around the former government attorney to prevent the disqualification of the firm or any of its partners or associates. *Ross v. Canino*, 93 *N.J.* 402, 461 *A.*2d 585 (1983).

Basically, the RPCs reflect the guiding principle that a lawyer shall not represent a private client if such representation

involves taking improper advantage of his or her former governmental position, or gives the appearance of so doing. Furthermore, the RPCs recognize that there may be situations in which even though there has been no actual impropriety, an appearance of impropriety may arise and must be prevented. *See Reardon, supra,* 83 *N.J.* at 473, 416 *A.*2d 852 (noting that an appearance of impropriety will be found if there is a "reasonable perception of some impropriety"). *But cf. In re Executive Comm'n on Ethical Standards,* 116 *N.J.* 216, 226, 561 *A.*2d 542 (1989) (construing Act to find "no risk of undue influence or appearance of undue influence" when a State university law professor teaches a clinical program which represents clients before a State agency). We recognize that there has been controversy surrounding the imposition of the "appearance of impropriety" standard and that it is not universally accepted. *See Report of the Supreme Court Committee on the Model Rules of Professional Conduct, Special Supplement to the N.J.L.J.,* 3–5 (July 28, 1983). Nonetheless, our adoption of RPCs that explicitly impose that standard makes clear that it still applies in New Jersey.

■ The most obvious applications of the "appearance of impropriety" standard in the actions of part-time legislative aides are suggested in our cases dealing with the "member of the official family" doctrine. We have held in various contexts that even though a public employee has no actual conflict of interest or even any actual divided loyalty, he or she may be so closely connected in fact or in the public's mind with other public employees, boards, agencies, or branches of government that restrictions beyond those called for in actual conflicts cases are required. The doctrine is most often applied in the municipal context: a municipal attorney, an attorney who is a member of the governing body, an attorney for the board of adjustment, or a municipal prosecutor are all regarded as part of the official municipal family, and none may, as attorney, represent a private client before any board, agency, commission, or other part of the municipality, including its governing body. *See In re*

*Opinion 552*, 102 *N.J.* 194, 203 n. 2, 507 *A.*2d 233 (1986) (and cases cited therein).

The underlying principle is that there often exists in fact a close relationship between those responsible for municipal government in all of its branches, that they know each other very well, have long political and governmental ties, and that, in fact, they may very well be swayed by those ties in a way that detracts from the performance of their public responsibilities. Whether the conflict is actual or not, the public, the informed public, the reasonable public perceives it as a real risk. The attorney's conduct is circumscribed by that factually potential influence and by the public's reasonable perception of it. *See In re Advisory Opinion on Professional Ethics No. 361*, 77 *N.J.* 199, 202, 390 *A.*2d 118 (1978) ("Appearance of impropriety" arises when recently retired prosecutor represents a criminal defendant.).

In a different context, but with similar considerations, we have held that a municipal attorney may not prosecute disciplinary actions against police officers of that municipality, experience teaching us that his or her connection with police officers is such that he or she may compromise the public interest in the prosecution. There is also the possibility that the potential for such prosecution may chill the relationship between police officers and the municipal attorney in connection with the investigation and enforcement of related criminal matters. *Perillo v. Advisory Comm. on Professional Ethics*, 83 *N.J.* 366, 416 *A.*2d 801 (1980).

Other cases pose the possibility that the public employee's influence over other agencies of government may, again in fact or appearance, threaten the public interest. An attorney who is also a freeholder may not represent a defendant in a criminal matter in that county, for his power, in conjunction with that of other freeholders, over the prosecutor's budget may result in a compliant prosecutorial plea bargain influenced by the potential either of budgetary retribution or budgetary

reward. *Higgins v. Advisory Comm. on Professional Ethics,*
73 *N.J.* 123, 129, 373 *A.*2d 372 (1977).

Having examined the Act, the Legislative Code, and the
ethical rules applicable to attorneys, we now apply these rules
to lawyers serving as part-time legislative aides.

V

It is crystal clear that the ruling of the ACPE went beyond
the restrictions of the Act. While its initial opinion created the
impression that it was interpreting the Act, its subsequent
opinion as well as its briefs and oral argument make it clear
that it was relying on the RPCs.[4] The Act simply does not
prohibit attorneys who are part-time legislative aides from
appearing before any agency other than those connected with
the legislative branch. *N.J.S.A.* 52:13D–16a and the Legislative
Code § 3:3. The only argument that could be advanced in favor
of a claim that the Act reaches that far would have to be based
on an appearance of impropriety.

We note that while the reach of the ACPE's restrictions is
not explicitly set forth either in the ACPE's opinions, briefs, or
in oral argument, an irresistible conclusion can be drawn from
the positions ultimately taken by the ACPE. It contends that
an attorney who is a part-time legislative aide may not take a
case against his or her "employer"—the State—that he or she
may not represent an interest "adverse to the State." In that
connection it views the "State" as encompassing all branches of

---

[4]The ACPE's ruling, because it does not rely on the Act, affects not only the
executive and legislative branches but the judiciary as well. Presumably, then,
lawyers working part-time for the judiciary or serving on any commissions,
boards, or agencies created by the judiciary would have the same restrictions
imposed on them. In addition, part-time lawyers serving in the executive and
legislative branches are, under the Opinion, precluded from representing a
defendant in any criminal matter, because clearly the State would be an
adverse party. Such a result contradicts *Opinion No. 3,* 86 *N.J.L.J.* 718 (1963)
(state workers' compensation employee not precluded from receiving criminal
assignments).

government, including all of the agencies, bureaus, and commissions. While it suggests that not every application to a State agency by a part-time legislative aide/lawyer on behalf of a private client constitutes representation of an interest "adverse to the State," it concludes that if the application is denied, any further action would indeed be "adverse to the State," and further that in 99% of the cases, for some reason, the initial representation would be "adverse to the State." We agree with the State's observation, through the Attorney General, that it may be unethical for an attorney to undertake representation if he knows at the outset that if initially unsuccessful he will have to terminate that representation. By that reasoning, it would be unethical for a part-time legislative aide/lawyer to make any such application to a State agency, knowing that if it is denied, his client must get another lawyer. When all of this is put together, it adds up to the conclusion on the part of the ACPE that a legislative aide simply cannot represent a private client before a State agency in any way, shape, or form.

The ACPE's basis for this ruling is the RPCs. The RPC most heavily relied on is 1.7, for the ACPE regards the State as the legislative aide's "client" and takes the position that a lawyer cannot represent a client and at the same time sue that client. *See RPC* 1.7(a). Part of the ACPE's reasoning is that whether the State is in fact the legislative aide's client, a knowledgeable member of the public might reasonably think it is, simply because the legislative aide is a lawyer working for the State. Therefore, the ACPE's restrictions are based both on its notion of the applicability of the RPCs and its conclusions of fact concerning the public's probable perception. The ACPE ignores the fact that the "client" (employer—State) is so varied, so multifaceted, so extensive that to regard it as one unitary monolithic employer/client is unrealistic.

Given the record in this case, we cannot accept the *per se* position of the ACPE. It depends completely on the assertion of a factual proposition not evident: that the public would view a part-time legislative aide as a lawyer hired by the State to

provide legal representation for the State, its client; and further, that the public would perceive this part-time legislative aide as having not just the agency or board or bureau with which he or she is connected, but the entire State government, as his or her client. As noted below, the deficiencies in this record prevent us from making any solid conclusions about the potential for an appearance of impropriety, but it is precisely because of this inadequacy that we are unable to accept the ACPE's factual assertions. Not only is there nothing in the record to suggest the public's belief in this regard, but as the State points out, in the twenty years that the Act has been in effect, there is no indication of any complaint from anyone in any forum anywhere of a part-time legislative aide abusing the public trust—not even a *claim* of such abuse. While this is certainly not dispositive, given a record devoid of any proof to the contrary it is certainly a strong indicator that the public, presumably aware at some point over these twenty years of part-time legislative aides acting as lawyers before State agencies, before the courts, and in other capacities, does not perceive either reasonably or unreasonably anything improper in such representation. We note that the recently completed report of the Ad Hoc Commission on Legislative Ethics and Campaign Finance,[5] which made numerous detailed comments and recommendations on a variety of subjects including conflicts of interest under the Act and the Legislative Code, expressed no concern about the current application of the relevant section of the Act and the Code to part-time legislative aides. *See Ad Hoc Commission on Legislative Ethics and Campaign Finance, Report to the President of the Senate, the Speaker of the General Assembly and Members of the New Jersey Legislature,* at 28–35 (Oct. 22, 1990). Given this

---

[5]The Commission was composed of nine members including two State Senators, two State Assemblymen, and prominent members of the New Jersey bar and business community, and was chaired by the Director of the Eagleton Institute of Politics at Rutgers University.

set of facts and circumstances, the Act's almost explicit permission takes on added weight. There can be no doubt that legislative aides were understood by the authors of the Act—and presumably the Governor's Office—as being included as special State officers and employees, and the Code of Ethics expressly identifies them as such.

 Having noted what the record does *not* prove, we should point out what it suggests, so that our ruling can be better understood and to point out potential problems for the future. Zublatt anticipated that his duties would be comprised of analysis of proposed legislation, periodic Assembly appearances, conferences with constituent lobbyists, and public speaking engagements on behalf of the Assemblyman. If that is all he does, and if he is just starting work, the potential for an appearance of impropriety is almost nonexistent. It is probable that a reasonably intelligent citizen with full knowledge of the facts would not think that he is a "lawyer for the State," or that he has any influence over any State agency. Most citizens would think that he is just another lawyer peripherally involved in politics, trying to help an Assemblyman understand legislation, trying to get him some votes by dealing with constituents and making speeches, and perhaps helping him deliver documents, statements, and other things by virtue of his—the legislative aide's—"Assembly appearances" (which we interpret simply as being present in Trenton on occasion when the Assembly is in session). While every person in public service, full-time or part-time, no matter what his or her duties and functions, is a cog in the wheels of government, this tiny cog, at least as described to us, does not seem capable of jamming the process in any way. That would especially be the case if the Assemblyman for whom he or she works occupies no special position in the Legislature. Given that combination of those facts, we would confidently hold that there is no appearance of impropriety. That holding, however, is strictly limited to the facts as given to us and as assumed above. While we suspect that it is a common pattern, we are not sure, although we *are*

sure that even if common, there are a significant number of variations.

This focuses our attention on what is implied above, namely, the paucity of this record. What we know beyond doubt is that part-time legislative aides like Zublatt are selected by legislators to do whatever it is the legislator directs. We do not know, however, how close to full-time his labors are, nor the significance of his "Assembly appearances," nor how important an employee he may turn out to be both in fact and in appearance. It was suggested in oral argument that legislative aides do not even come to Trenton or appear in the legislative chambers. We suspect, however, that many part-time legislative aides *do* come to Trenton, *do* attend their legislator in his or her offices in Trenton, *do* appear on the floor of the Assembly or Senate on occasion, and that some work practically full-time. The appropriations bill indicates that every legislator has $70,000 annually available for legislative aides. *Manual of the Legislature of New Jersey 1992* at 204. We assume that some are hired at fair salaries, being treated in terms of State benefits and otherwise as full-time State officers and employees, although perhaps still technically "special State officers and employees" because no law authorizes or provides for their compensation (or even mentions "legislative aides"). Furthermore, we assume it is possible that a close identity in fact and appearance may exist between a legislator and his legislative aides. Some legislative aides may work for one year or less, some for many years. Some may become politically important because of their position with the legislator, and some may become influential in fact or in appearance because of the relationship.

The consequences of these variations are many, and difficult to predict, but that they could lead to an appearance of impropriety in some cases is clear. For example, if a legislative aide worked practically full-time for a legislator at a fairly significant salary, and if that legislator was the head of an

appropriations committee of the Legislature, and if the aide year after year made budgetary analyses for the legislator, including regular contacts with one of the agencies whose budget is controlled by the appropriations committee, and if it became well known that this legislative aide was someone on whom the legislator strongly relied in connection with the budget of that agency, it seems clear that it would be improper for that lawyer/legislative aide to represent any private interest before that agency. It is even arguable that under those circumstances, that legislative aide should not appear before any agency at all. Equally persuasive is the example of a legislative aide to the chair of an insurance committee, for example. That aide would presumably be guilty of an appearance of impropriety were he or she to represent a private party on an application and hearing before the Insurance Commissioner.

As suggested above, the variations and permutations are innumerable, but given our lack of knowledge about whether these examples are more or less common than Zublatt's situation, we find it impossible to formulate a *per se* rule, or even a rule that tries to provide categories for guidance of part-time legislative aides. We just do not know what the appropriate categories are. Suffice it to say that when that part-time legislative aide realizes or should realize that he or she has become so identified either with the legislator or with the entities that the legislator is connected with (either committees, agencies, or other parts of government) that a reasonable person with knowledge of the facts might fairly become concerned that the aide's impact on the agency might adversely affect the public interest, his or her appearance before it would be improper.

A case could be made, we suppose, for the proposition that the mere fact of having been selected by the legislator as a part-time aide suggests enough influence to raise the possibility that that aide's appearance before a State agency has precisely

the same potential impact as the appearance of the legislator, an appearance that is prohibited. We do not say that that is a "fanciful possibility" (*Higgins, supra*, 73 *N.J.* at 129, 373 *A.*2d 372), only that on the record before us, it is not a sufficient possibility to mandate a *per se* rule.

Whether *per se* rules or standards to be applied on a case-by-case basis are used in connection with the enforcement of the RPCs and with the ethics principles and applications flowing from our many cases, *e.g., In re Opinion 552, supra*, 102 *N.J.* at 205–06 n. 3, 507 *A.*2d 233; *Perillo, supra*, 83 *N.J.* at 376–77, 416 *A.*2d 801; *In re Dolan*, 76 *N.J.* 1, 12–13, 384 *A.*2d 1076 (1978), depends on the nature of the problem, the nature of the rule, and our own good judgment. We assume that bright line *per se* rules will be found more often in cases affecting public employment and public employees than in those cases limited strictly to private practice. *Cf. In re Opinion 452*, 87 *N.J.* 45, 50, 432 *A.*2d 829 (1981) (noting public/private distinction). We note for instance, the *per se* rule prohibiting a freeholder/lawyer from handling the defense of criminal charges in the county in which he or she serves. The *per se* nature of that rule, however, is dictated not as much by the fact of public employment as it is by the circumstances of the situation: in *every* case where that combination of facts exists, the freeholder/lawyer will be part of a governmental entity that controls the prosecutor's budget. No more is needed: the prohibition is absolute. Here, however, the appearance of impropriety rests entirely on a combination of factors of enormous variety. Given the record before us, and given our impression as to the potential varieties of the relationships, we are influenced by the countervailing considerations that argue against the *per se* prohibition embedded in the ACPE's opinion.

While we assume that we may be more sensitive to the need for regulation of the bar in the public interest than are the Executive and the Legislature—since that is primarily our responsibility—we do not and should not assume that those

branches are any less concerned with the preservation of public confidence in government. The Executive and the Legislature know, perhaps better than we, what appearances are likely to have an adverse effect. They are as concerned as the judiciary with avoiding even the appearance of "trading on influence," which we have sought to curtail in RPC 8.4(e) (misconduct for a lawyer to attempt to improperly influence a govefnment agency or official). While we recognize their commitment, we do not imply that we would accede, or indeed that we do accede, to the executive and legislative judgment about ethical prohibitions placed by the Act on lawyers serving as part-time legislative aides. However, given the fact that the Executive and the Legislature passed the Act and supplemented it with Codes of Ethics, we believe that considerable deference should be given to their judgment. When that fact is combined with the asserted damage to the public interest that will result from the ACPE's *per se* rule, the scales tip even further in favor of its reversal. We are told by the Executive that if we do not reverse *Opinion No. 621*, hundreds of attorneys will be forced to resign from boards and commissions within the executive branch (and presumably more within the legislative branch) because as special State officers, they and their law firms will no longer be able to handle any matter that involves the State. That is indeed a severe restriction, for anyone familiar with today's private practice knows that in almost every commercial transaction somehow or other the State is involved.

We do not know how many of these legislative aides are lawyers; we do not know just how badly the Legislature itself will be affected in that respect.[6] The issue here, the question of the overall impact on State government of *Opinion No. 621*, goes beyond its impact on the Legislature's ability to recruit part-time legislative aides, for what we are talking about are the many other lawyers in both the Legislature and the execu-

---

[6]One of the attorneys at oral argument "guessed" that about 40 or 50 of the legislative aides are attorneys.

tive branch who will be affected. We need not belabor the value of attorneys in all of these positions, especially perhaps as part-time legislative aides. Their knowledge of the law and of government is important. And we need only mention the fact that among the obligations of the bar is that of performing public service. *RPC* 6.1. In many cases these attorneys are not compensated and do indeed help government and the public. While this by itself would not be enough to justify the State's position, (*see Reardon, supra,* 83 *N.J.* at 477, 416 *A.*2d 852 (no right to the services of an attorney disqualified because of an ethical requirement)), it is added reason why we should not transform this almost barren record into the kind needed to support the *per se* rule of *Opinion No. 621.*

## VI

### *Comity*

We do not find this to be a case in which we need reach the question of the impact of considerations of comity between the branches on what would otherwise be our ruling concerning attorney ethical standards. Very simply we find, apart from considerations of comity, that there is no basis for any *per se* rule barring legislative aides from appearances before State agencies under the RPC. While we weigh in the balance in reaching that conclusion the judgment of the Executive and the Legislature that no appearance of impropriety is involved (although counsel agree that on occasion there may be such, as we so find in this opinion) and the damage to the public interest that would occur were a *per se* rule to be applied, basically our decision turns on the fact that the record is insufficient to sustain any claim that the appearance of impropriety is so pervasive as to warrant a bright-line prophylactic rule. The judgment of the Legislature and the Executive concerning the lack of such appearance is simply factually persuasive, and the impact on the public interest, even though asserted by the executive and legislative branches, would be a concern of ours

no matter who asserted it. *See Greenberg v. Kimmelman*, 99 *N.J.* 552, 561, 494 *A.*2d 294 (1985); *Knight v. City of Margate*, *supra*, 86 *N.J.* at 391, 431 *A.*2d 833 (noting that judicial branch will give deference to other branches of government when a legitimate governmental interest exists involving constitutional concerns in the judiciary). Issues of comity will have to be faced if the other branches of government ask us to defer to their needs and their judgment when, but for that deference, we would rule otherwise or when, but for that deference, we might otherwise have imposed a *per se* rule. That is not the situation here.

## VII

### *Conclusion*

Because Zublatt has decided not to take the position as legislative aide, the matter is moot concerning him. *Opinion No. 621* remains, however, as an advisory to the bar. We therefore modify it to the extent required by this opinion. Attorneys who are part-time legislative aides shall be subject only to the restrictions of the Act, the Legislative Code, and the RPCs as described above; the same shall apply to attorneys who are special State officers and employees by virtue of their service on various legislative and executive boards and commissions.

*For modification*—Chief Justice WILENTZ, Justices CLIFFORD, HANDLER, O'HERN, STEIN and Judges PRESSLER and GRUCCIO—7.

*Opposed*—none.