# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3227-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.S.,

      Defendant-Appellant,

and

L.H.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.H.,

      a Minor.

_____

> **APPROVED FOR PUBLICATION**
>
> **March 19, 2020**
>
> **APPELLATE DIVISION**

Argued February 5, 2020 – Decided  March 19, 2020

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-1l-0051-18.

Mary Kathleen Potter, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mary Kathleen Potter, on the briefs).

Joshua Paul Bohn, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Joshua Paul Bohn, on the briefs).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minor-respondent (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian. Devlin, on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Thirty-eight-year-old T.S. is the biological mother of A.H. (Andrea), a little girl born in April 2015.[1] Twenty-six-year-old L.H. is Andrea's biological father. T.S. appeals from the judgment of guardianship entered by the Family Part on March 11, 2019, which terminated her parental rights to Andrea. The Division of Child Protection and Permanency (Division) presented its case for termination of defendants' parental rights to Andrea over a period of six nonsequential days, commencing on December 11, 2018 and ending on

---

[1] We use a pseudonym to refer to the child and initials to refer to the parties and other related individuals to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

January 16, 2019. T.S. attended only two trial days. She was present on the first day and returned to testify in her own defense on the last day of trial. L.H. was present at the start of the first day of trial but left before the conclusion of that day's proceedings. L.H. did not attend the remainder of the trial and is not a party in this appeal.

For the first time on appeal, T.S. argues the judgment of guardianship must be vacated and the case remanded for a new trial because the resource parent with whom the Division placed Andrea since 2016, and who plans to adopt the child, worked as a domestic violence liaison in the district office that was responsible to investigate and manage this case from its inception. T.S. emphasizes that although the Division could have easily avoided this significant conflict of interest by simply transferring the case to a different district office, it did not take action to remedy the situation.

Relying on the United States Supreme Court's decision in Brady v. Maryland, T.S. argues that the Division's failure to forthrightly disclose this material conflict of interest violated her right to due process of law, in the same way a criminal defendant's right to due process is violated when the State fails to disclose material information favorable to the defense. 363 U.S. 83, 87 (1963). Independent of this material omission, T.S. argues this case must be remanded because the Division did not present clear and convincing evidence

to support the trial judge's findings that termination of her parental rights is in the child's best interest.

The Division argues the evidence presented at the guardianship trial clearly and convincingly proved that termination of T.S.'s parental rights is in the child's best interest. In response to T.S.'s claim of a conflict of interest, the Division argues that T.S.'s reliance on Brady is misplaced because the Supreme Court's holding in that criminal case is not applicable to guardianship proceedings. However, even if we were to apply Brady to this case, the Division claims it complied with its discovery obligations by providing T.S.'s trial counsel with the caseworker's contact sheets that showed the resource parent was assigned to the district office as a domestic violence liaison.

The Law Guardian agrees that T.S.'s parental rights to Andrea are constitutionally protected and cannot be terminated without due process of law. However, the Law Guardian also agrees with the Division's argument that Brady's discovery obligations in criminal trials are not applicable to guardianship proceedings. In this light, the Law Guardian characterizes the resource parent's role in the Division's district office as "peripheral." The Law Guardian argues that T.S. has the burden to produce evidence of "layers of bias, through service providers and professionals independent of the Division." Without such proof, the Law Guardian argues "it is highly speculative that

4

questioning the caseworker would have led to anything other than a fishing expedition."

This appeal came for oral argument before this court on February 5, 2020. On February 7, 2020, we sua sponte ordered the parties to submit supplemental briefs addressing the following three questions:

> (1) Did the [Division] violate the Conflicts of Interest Law, N.J.S.A. 52:13D-12 to -27 or any other relevant internal policy or directive?
>
> (2) Is a remand necessary for the Family Part Judge to make specific findings of the type of conflict interests that occurred here? If so, should the Family Part Judge thereafter determine whether these conflicts of interests undermined the ability of the [Division] staff assigned to this case to fairly and impartially evaluate defendant's conduct and/or the foster parent's conduct?
>
> (3) Was the [Division] responsible to disclose to the Family Part Judge, defendant's counsel, the Law Guardian, and/or the Attorney General the existence of this conflict of interest? If so, what sanction, if any, should be imposed for the [Division's] failure to carry out this ethical responsibility?

After reviewing the parties' submissions, including the supplemental briefs, and considering the evidence presented at the guardianship trial, we hold the Division violated the Conflict of Interest Law, N.J.S.A. 52:13D-12 to -27, and the ethical standards promulgated by the Department of Children and Families (DCF) and incorporated into the Department of Children and Families

Policy Manual (Policy Manual) when it failed to transfer T.S.'s guardianship case to another regional office based on the resource parent's assignment as a domestic violence liaison. The Division's failure to take timely and effective action to address this material conflict of interest tainted the management of this case almost from its inception. Once the Division decided to seek the termination of T.S.'s parental rights to Andrea, the perception of bias and the probability of actual prejudice to T.S.'s constitutional right to parent her daughter became paramount.

Under these circumstances, we are left with only one tenable outcome: this matter must be remanded for the trial court to conduct a plenary hearing to make factual findings that are conspicuously missing from the trial record. For example: when did Division supervisors become aware that Andrea's resource parent was assigned to the district office as the domestic violence liaison?; did the supervisors make any effort to transfer the case after knowing the resource parent's employment status?; was T.S.'s trial attorney aware of the resource parent's employment status?; if not, why not?; if so, did counsel discuss this issue with T.S.?; were the Deputy Attorney General (DAG) and the Law Guardian aware of the resource parent's employment status?; if so, did either one make any effort to apprise T.S.'s attorney and the trial judge?; was the trial judge aware of the resource parent's employment status? These threshold

inquiries merely provide a glimpse of the issues that need to be explored to develop a reliable factual record. The purpose of the plenary hearing is to enable the judge to ascertain the extent of the harm caused by the conflict of interest and explore what remedies, if any, are possible to counteract or alleviate this harm.

Furthermore and independent of the conflict of interest issues, we are compelled to remand this matter to the Family Part because the record of the guardianship trial is devoid of key factual findings that directly relate to whether the Division presented a sufficient case to warrant the termination of T.S.'s parental rights by clear and convincing evidence. Specifically, the record before us does not show that the trial judge: (1) made credibility findings regarding T.S.'s testimony, (2) identified which of the two psychologists who testified as expert witnesses was more persuasive, (3) articulated a basis for rejecting or distinguishing the opinion of the other psychologist, and (4) applied the opinions offered by the experts in his analysis of the four statutory prongs in N.J.S.A. 30:4C-15.1(a). There are thus two factually independent and legally compelling grounds to vacate the judgment of guardianship and remand this matter to the Family Part.

I

Conflict of Interest

In their supplemental submissions, T.S., the Division, and the Law Guardian all agree the Division violated the ethical standards established in the Conflict of Interest Law and the protocols adopted by the Department of Children and Families reflected in its Policy Manual. They disagree, however, about what should be this court's response to these ethical transgressions. The Division and the Law Guardian are of one mind on this point. The Division argues it honored its discovery obligations when it provided T.S. with 1741 pages of documentary evidence, which included a number of contact sheets filed by the caseworkers who monitored and managed Andrea's case.

In the initial brief filed in this appeal, T.S.'s appellate counsel identified only three contact sheets that in her view revealed the conflict of interest involving the resource parent. In the supplemental brief submitted by the Division in response to this court's post-argument order, the DAG identified twelve contact sheets that documented Division caseworkers' interactions with the resource parent. The comments and observations noted by the caseworkers in these contact sheets reveal a pattern of conduct oblivious to any ethical considerations.

Division Contact Sheets

As part of the evidence presented to the Family Part in support of the guardianship complaint to terminate T.S.'s parental rights, the Division alleged

8

the Hamilton Township Police Department reported to the Division that on January 10, 2016, police officers responded to the residence of T.S. and L.H. "due to a physical altercation" between them. A representative of the Police Department told the Division that T.S. was "the aggressor" in this act of domestic violence and was allegedly "under the influence of alcohol and intoxicated at the time of the altercation." On January 12, 2016, with the assistance of Hamilton police officers, the Division executed an emergency Dodd[2] removal of Andrea and placed her in the physical custody of the resource parent.

The next day, T.S. and L.H. went to the local Division office to inquire about what caused Andrea's involuntary removal from their care and custody. A Division caseworker and a supervisor told the parties that Andrea's removal was due to T.S.'s "admission" that she illegally sold her prescription pills and "[L.H.'s] marijuana abuse." Both the caseworker and the supervisor also expressed "their concern in regards to the domestic violence incident" that occurred two days before Andrea's removal. According to the account of the encounter in the verified guardianship complaint, L.H. "minimized the incident

---

[2] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

and stated . . . 'all couples argue.'" The Division also averred that T.S. "was substantiated for risk of physical injury/environment injurious to health and welfare of the minor child."

The earliest relevant Contact Sheet is dated May 18, 2016, more than five months after Andrea was involuntarily removed from her biological parents' custody and placed with the resource parent. The Contact Sheet entered by Division caseworker Aisha Little memorialized what she discussed in a telephone call made by Andrea's resource parent, B.O., who is identified here as "RP."

> Worker received a call from RP. RP reported she had been leaving messages for the previous worker, Mr. Rodriguez. She reported the Division's workers have always called her on her work cell phone. She provided worker with her personal cell phone [number] . . . . Worker thanked RP for this information. R[P] reported [Andrea] is sick today. She reported she had been sick since Saturday with a fever that has been on and off. RP reported her friend . . . who is a nurse took [Andrea] to the doctors and is watching her today. [Andrea's] throat is red and appears irritated, but strep was ruled out. RP reported she has been sick numerous times since being at the daycare. RP reported she had pink eye twice, and hand foot and mouth. R[P] reported she is picking up everything from the daycare. RP voiced concern about [Andrea's] visit supervised by the previous worker. She reported [Andrea] came home smelling like smoke and "weed." RP reported it appears the family is up to their old tricks.

> When asked about her work schedule, worker was informed RP would be the new DVL [Domestic Violence Liaison] for the Mercer South Office. RP reported her hours of work to be 9 to 5pm. She reported she is home by 5:30 pm. She reported [Andrea] usually eats around 6. Worker reported she would try to make it to the home by the end of the week.
>
> [(Emphasis added).]

This Contact Sheet was electronically approved by caseworker Little on June 13, 2016. Division Field Office Supervisor Latanya Forest electronically approved it on July 25, 2016.

The next Contact Sheet, dated June 2, 2016, was "created" by Field Office Supervisor Imani Coleman-Robinson. It summarizes T.S.'s alleged criminal activities involving the illicit sale of prescription opioid medication, L.H.'s substance abuse problem with marijuana, the Division's unsuccessful attempt "to implement a safety protection plan," and the domestic violence incident that resulted in Andrea's emergent and involuntary removal from the custody of her parents and placement in the home of the resource parent who would eventually seek to adopt the child. The Contact Sheet also mentions that T.S. "came home drunk and was the aggressor" in an incident of domestic violence against L.H. The caseworker also described that both T.S. and L.H. "have not been compliant with services that include parenting classes, anger management classes, and individual counseling."

Supervisor Coleman-Robinson structured her six-page Contact Sheet into six separate subheadings. The comments and observations she made in each subheading about Andrea, T.S., and the resource parent elucidate how the conflict of interest created by the resource parent's employment status affected the Division's management of this case from its inception.

## PLACEMENT

Following [Andrea's] removal from her parents, she was placed in the unrelated resource home of Ms. [B.O.] in Hamilton, NJ. The child is doing wonderful in the resource home and the caregiver is committed to adoption. <u>It was recently learned that Ms. [B.O.] applied for and was hired as the Domestic Violence Liaison in the Mercer South Local Office. She works in the office every Monday</u>.

## VISITATION

[T.S.] visits the child in the Mercer South Local Office and the visits will be transitioned to Legacy. Visits are currently scheduled Mondays and Wednesdays from 10:30 a.m. to noon and are occasionally longer. Visits are going fine and no concerns noted other than the resource parent asking that [T.S.] stop changing the child's clothes during the visit due to a concern about [T.S.] having bed bugs in the past. Sibling visits are occurring and will be completed at Legacy. Family will be referred.

## PERMANENCY

Although [T.S.] has reported that she and [L.H.] are no longer a couple, the April 14, 2016 Legacy Treatment Services report provided for [T.S.'s] visitation with [her other child] indicates, "Care

Coordinator observed [T.S.'s] engagement ring and asked if she was engaged. [T.S.] stated, "Yes, to my daughter's father. But I already told him, this ring[] doesn't mean anything if he doesn't do his service to help get our daughter back." Due to concerns of domestic violence, this should be explored. [T.S.] will be referred for domestic violence services but cannot be referred to the DV liaison in the Mercer South Local Office as this is [Andrea's] resource parent.

[(Emphasis added).]

Supervisor Coleman-Robinson ended her Contact Sheet by identifying fifteen "tasks" that in her judgment needed to be completed. The following items include only those "tasks" that in our judgment reveal areas that need to be explored in a plenary hearing by the Family Part to determine how the Division's failure to transfer this case to another district office in a timely fashion affected T.S.'s right to parent her daughter:

5. Complete Family Reunification Assessment and Caregiver/Child Strengths and Needs Assessment.

. . . .

7. Ensure that the parents have been referred to all court ordered and recommended services.

. . . .

12. [T.S.'s] visits are currently in the Mercer South Local Office and should be transitioned to Legacy as discussed.

13. Make a conscience effort to keep [T.S.] and the resource parent separate in the local office. [T.S.'s]

13

visits are in the office on Mondays and the [Domestic Violence Liaison] is present on the same day in the office.

14. Refer [T.S.] to domestic violence services through another provider if possible. If not, the referral should be made to the DVL's supervisor and she should be advised of the confidentially of the matter.

15. Discuss ASFA[3] time frames and provide the KLG[4] vs. Adoption fact sheet to the parents and resource parent.

Field Office Supervisor Coleman-Robinson electronically approved her own Contact Sheet on June 10, 2016.

Caseworker Jennifer Armstrong entered a Contact Sheet on November 28, 2016, to document an event that occurred twenty-six days earlier on November 2, 2016. Caseworker Armstrong noted that "[f]ollowing [Andrea's] removal from her parents, she was placed in the unrelated resource home of Ms. [B.O.] . . . where she remains." B.O. lives with her sixteen-year-old son,

---

[3] ASFA is an acronym for the federal "Adoption and Safe Families Act of 1997," adopted by Congress in 1997. ASFA requires a state receiving federal funding to adopt procedures to prohibit persons who have been convicted of child abuse or neglect, spousal abuse, or any crime against children, or for a crime involving violence, from becoming resource parents. 42 U.S.C.A. § 671(a)(20). See N.J. Div. of Child Prot. & Permanency v. K.N., 435 N.J. Super. 16, 34-35 (App. Div. 2014); see also Resource Family Parent Licensing Act, N.J.S.A. 30:4C-27.3 to -27.15.

[4] KLG stands for the Kinship Guardianship Act, N.J.S.A. 3B:12A-1 to -7.

A-3227-18T3

Andrea, and a family dog. The caseworker noted Andrea was "doing well in the home" and that B.O. "wishes to adopt [Andrea]."

Near the middle of the Contact Sheet, Caseworker Armstrong mentioned that B.O. "is now a domestic violence liaison at the Mercer South and Mercer North Local Office. The case is restricted in NJS."[5] The caseworker also noted that "[a] few months ago[6], the caseworker did need to speak with [the resource parent] as she noticed that she was referring to the child [by another name], as were the daycare staff. The caseworker informed [the resource parent] that the child must be called by her name, [Andrea]."

---

[5] None of the parties defined "NJS." Whether it refers to some type of confidential or restricted Division database or record management system, we cannot say. We therefore have no basis to conclude this was an attempt by the Division to ameliorate the conflict of interest.

[6] "A few months ago" is a facially unacceptable way to identify when an event of this magnitude occurred. We expect the state agency entrusted to safeguard the safety and welfare of our children would demand far greater precision from those responsible to document these events. Our independent review of the Division record revealed that Division caseworker Aisha Little documented the same transgression by the resource parent in a Contact Sheet dated July 7, 2016. Caseworker Little wrote: "This writer also explained that bio mom noticed [Andrea] was becoming confused when she called her. RP indicated everyone calls her Anna, and its only mom and the workers that call her [Andrea]. Worker explained that was because her name is [Andrea]. RP indicated she would call her [Andrea]." However, as caseworker Armstrong's Contact Sheet dated November 2, 2016 shows, the resource parent continued to refer to the child by another name 118 days after caseworker Little explicitly explained to her that this unsanctioned behavior was confusing the child and upsetting T.S.

15

Caseworker Armstrong noted a report of a psychiatric evaluation of T.S. completed on November 4, 2016 indicated that T.S. was the "victim of significant physical abuse by her mother and sexual abuse by her mother's boyfriend, with her not receiving any support or protection from her mother even [after] she divulged being sexually abused."

The psychiatrist diagnosed T.S. as a

> victim of neglect, physical abuse, sexual abuse as a child, and domestic violence; perpetrator of domestic violence; provisional PTSD; unspecified depressive disorder vs. unspecified bipolar disorder; unspecified anxiety disorder; cannabis use currently in remission as per review of collateral sources; adolescent antisocial behavior; adult antisocial behavior with history of violations of restraining orders; presence of maladaptive personality traits in clusters A, B, and C.

Although the psychiatrist opined that T.S. should be treated with both pharmacological and therapeutic modalities, the caseworker wrote in the Contact Sheet that T.S. "is not on any medication at this time." Finally, as was the case in the prior Contact Sheets, caseworker Armstrong noted: "[T.S.] will be referred for domestic violence services but cannot be referred to the DV liaison in the Mercer South Local Office as this is [Andrea's] resource parent." (Emphasis added). Caseworker Armstrong also included a list of twenty-one "TASKS TO BE COMPLETED." Task number 9 recommended to "[c]onsider unsupervised visitation between [T.S.] and [Andrea]." Of particular relevancy

here, Task number 16 stated: "[r]efer [T.S.] to domestic violence services through another provider if possible. If not, the referral should be made to the [Domestic Violence Liaison's] supervisor and she should be advised of the confidentially of the matter." Armstrong "electronically approved" her own Contact Sheet on November 28, 2016, under the title of "Concurrent Planning Specialist."

The next relevant Contact Sheet was entered into the Division's records by Field Office Supervisor Coleman-Robinson on May 22, 2017 to memorialize an Annual Internal Placement Review of this case held at the Division's Mercer South Local Office on May 16, 2017. The following "interested parties" attended the review: Permanency Caseworker Laverne McDow; Casework Supervisor Ava Sharpe; and Field Office Supervisor Coleman-Robinson, who identified herself as "Internal Placement Reviewer." The Contact Sheet also noted that Child Health Unit Nurse Cheryl Berkin was "consulted following the review." The previous "Family Team Meeting" occurred on February 28, 2017.

The Contact Sheet included the following statement under the subheading "PLACEMENT":

> Following [Andrea's] removal from her parents, she was placed in the unrelated resource home of [B.O.] in Hamilton, NJ. The child is doing wonderful in the resource home and the caregiver is committed to

17

adoption if the child cannot be reunified with her biological family. [B.O.] currently works as a domestic violence liaison at the Mercer South and Mercer North Local Offices. The case is restricted in NJS. Since the 5th month Internal Placement Review on this case, [Andrea] has remained in her resource home with [B.O.] and continues to do well.

[(Emphasis added).]

Under the subheading "SERVICES/STABILITY" the Contact Sheet noted "[t]he Division continues to work with [T.S.] towards reunification with [Andrea]." Immediately following this ostensible mission statement, the Contact Sheet described the therapeutic services the Division provided T.S. and acknowledged that she "is actively completing the parenting element of the program; as well as attending individual therapy." The Contact Sheet also documented that on May 1, 2017, "the Division received an RI regarding [T.S.]" Although the initials "RI" are not explained, they relate to an anonymous report of unsubstantiated allegations that T.S. was engaged in prostitution and had "a domestic violence altercation about a week ago . . . [where] [L.H.] broke a window."[7] After discussing the services the Division provided to T.S. up to that point, the Contact Sheet noted "[t]here are also concerns of domestic violence with [T.S.]."

---

[7] Because the "RI" reporter also alleged T.S. was abusing illicit drugs, the Division requested her to submit to a drug screen. "The results returned negative for all illicit substances."

Under the subheading "PERMANENCY," the Division noted T.S.'s "progress with reunification services and compliance with the court order[,]" and reaffirmed that "the Division's permanency goal remains reunification with a concurrent goal of adoption at this time." To realize that goal, the Contact Sheet listed eighteen "TASKS TO BE ADDRESSED TO ENSURE PERMANENCY." Task 9 stated: "The last RI mentioned concerns regarding domestic violence. [T.S.] should be referred for domestic violence counseling if this is a concern. The Mercer office's liaison cannot be used as this is the child's resource parent." Field Office Supervisor Coleman-Robinson electronically approved her own Contact Sheet on May 22, 2016.

II

Standard for Assessing Conflict of Interest

When the Legislature adopted the Conflict of Interest Law effective January 11, 1972, it established the overarching public policy that guides our review of the conduct of the Division employees who managed this guardianship case.

> In our representative form of government, it is essential that the conduct of public officials and employees shall hold the respect and confidence of the people. Public officials must, therefore, avoid conduct which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated.

19

[N.J.S.A. 52:13D-12(a) (emphasis added).]

"The paramount objective of the Conflicts of Interest Law in general is to 'ensure propriety and preserve public confidence' in government." Knight v. Margate, 86 N.J. 374, 391 (1981). The Conflict of Interest Law applies "not only to situations of actual conflict of interest and divided loyalty, but also to their appearance." In re Advisory Comm. on Prof'l Ethics Opinion 621, 128 N.J. 577, 585 (1992). Because the Conflict of Interest Law covers such a wide spectrum of public employees, the Legislature directed State agencies that perform highly specialized functions to develop and implement their own ethical standards that reflect and incorporate the agency's unique mission.

> To ensure propriety and preserve public confidence, persons serving in government should have the benefit of specific standards to guide their conduct and of some disciplinary mechanism to ensure the uniform maintenance of those standards amongst them. Some standards of this type may be enacted as general statutory prohibitions or requirements; others, because of complexity and variety of circumstances, are best left to the governance of codes of ethics formulated to meet the specific needs and conditions of the several agencies of government.
>
> [N.J.S.A. 52:13D-12(b) (emphasis added).]

Effective September 19, 2014, the Department of Children and Families adopted a Policy Manual for Division employees to supplement the Uniform Ethics Code and address "the particular needs and problems of the

Department." The Policy Manual is structured in Sections that identify categories or areas of activities to guide Division employees.

<u>Section G: Misuse of Official Position</u>

1. Each Department employee and special State officer shall conduct him or herself in an appropriate and professional manner during the course of performing his or her public duties. <u>Each DCF employee or special State officer is responsible for setting clear boundaries to assure that he or she does not establish an improper relationship with any person who is supervised, served, regulated, being investigated, or has a prior history with the Department</u>.

. . . .

3. <u>No Department employee or special State officer shall perform official duties in any manner from which it might be reasonably inferred that the influence either of a personal relationship or of an unprofessional circumstance caused the employee to act in a biased or partial manner</u>.[8]
[(Emphasis added).]

The section of the DCF Policy Manual that addresses the Management of Resource Family Parents includes "Domestic Violence Liaisons" under the definition of "DCF employee." Volume IV, Chapter B, Subchapter 6, Issuance 800 "establishes policies and procedures for DCF staff to follow when a DCF

---

[8] The Division's Policy Manual can be found at the following link: https://www.state.nj.us/dcf/policy_manuals/DCF-IV-A-1-100_issuance.shtml.

employee seeks to become a resource family parent."   Under this regulatory

scheme, the Ethics Liaison Officer (ELO)

> is responsible for guiding the application process for any DCF employee requesting to be a kinship caregiver or adoptive parent in an effort to avoid conflicts of interests or potential conflicts of interest.
>
> The ELO also serves as a neutral party overseeing all procedural matters regarding the process and acts as the liaison between the applicant and [Division] executive management.[9]

Once a DCF employee expresses an interest in becoming the resource

parent of a child under the Division's supervision, the employee must recuse

her or himself "from any activity that may influence or be perceived to

influence the outcome of the agency's decision regarding the application."

(Emphasis added). The scope of this recusal includes, "but is not limited to,"

gathering information about the child through open public sources or

reviewing confidential Division records concerning the case or the child.  "The

Ethics Liaison Officer will instruct the employee of proper conduct in relation

to his or her application if the application is approved to proceed for a home

study."  (Emphasis added).

---

[9] Volume IV, Chapter B, Subchapter 6, Issuance 800 of the Division's Policy Manual can be found at the following link: https://www.nj.gov/dcf/policy_manuals/CPP-IV-B-6-800_issuance.shtml.

Towards that end, the Division must take "appropriate and timely identification, assessment, and intervention to promote successful outcomes regarding child safety, well-being, and permanency."  This requires "a collaborative approach which may include the [Division] Worker, Supervisor, Case Work Supervisor (CWS), Local Office Domestic Violence Liaison (DVL), Deputy Attorney General (DAG), law enforcement, and the courts to ensure child safety and well-being."  (Emphasis added).  The following description shows how Domestic Violence Liaisons are expected to be a key part of this collaborative approach:

> Domestic Violence Liaison (DVL): is a partnership between the Department of Children and Families and the NJ Coalition to End Domestic Violence at the State level and the [Division] Local Offices and domestic violence programs at the county level. Domestic Violence Liaisons are domestic violence specialist co-located at the [Division] Local Offices (when available), to provide case consultation, support and advocacy for domestic violence victims and their children. The purpose of this collaboration is to:
>
> - Increase safety, improve outcomes, and reach the primary goals for children and their non-offending parent in domestic violence situations.
> - Strengthen DCF/[Division] capacity to provide effective assessments and intervention for families in domestic violence situations.[10]

---

[10] Volume VIII, Chapter B, Subchapter 1, Issuance 100 of the Division's Policy Manual can be found at the following link: https://www.nj.gov/dcf/policy_manuals/CPP-VIII-B-1-100_issuance.shtml.

Volume VIII of the DCF Policy Manual contains eight "Special Interest Topics" organized in alphabetical order from A to H. Section B addresses "Domestic Violence." Its purpose is to establish "policy and procedures for [Division] staff working with families where domestic violence is alleged, suspected, or co-occurs with child abuse or neglect." The "Policy" of the Division in cases involving domestic violence is to "[p]ut safety first." The Division must not permit a child to remain "in homes that have been assessed as unsafe, without a Safety Protection Plan . . . in place." However, reunification is appropriate "once safety concerns have been remediated or a safety intervention is in place."

Subsection E describes the conditions imposed on DCF employees who wish to become a kinship resource family or adoptive parent; Subsection F, denoted "Required Approvals," lists the DCF staff members who must approve the application "[b]efore an employee makes an application to the Resource Family Support Unit to be considered for a kinship resource or adoptive home." The DCF staff members involved in this pre-qualification approval process are: the employee's Direct Supervisor, the Local Office Manager, the Area Director, the DCF Ethics Liaison Officer, and the Division Director, who is the one empowered to "give[] the final approval to move the selection process."

Of particular relevance here, the DCF Policy Manual expressly states that after this preapproval process is completed, the Division's "Area Director responsible for the open case determines the office of supervision. The child's case is supervised by a Local Office other than the one where the employee is officially stationed. The assigned Worker has no professional, personal, or familial relationship to the employee." (Emphasis added).

Appearance of Impropriety

In Knight v. Margate, the Supreme Court was confronted with "the fundamental issue of whether the Conflicts of Interest Law, as most recently amended . . . impinges upon the Supreme Court's constitutional powers under Art. VI, § 2, par. 3." 86 N.J. at 391. The Court ultimately upheld the constitutionality of the statute. Writing for a unanimous Court, Justice Handler explained: "We do not believe that the restrictions imposed by the latest amendments, L. 1981, c. 142, will in any way interfere with the sound administration of the judicial system or undermine the proper regulation of the ethical conduct of members of the judiciary and the bar." Id. at 394. Justice Handler noted that "[t]here can be no equivocation on the point that the New Jersey Conflicts of Interest Law, as most recently amended, vitally serves a significant governmental purpose. The paramount objective of the Conflicts of

25
A-3227-18T3

Interest Law in general is to 'ensure propriety and preserve public confidence' in government." Id. at 391 (quoting N.J.S.A. 52:13D-12(b)).

The Court revisited the Conflict of Interest Law to determine the propriety of legislatively imposed "ethics restrictions on the private practice of lawyers who are part-time legislative aides." In re Advisory Comm. on Prof'l Ethics Opinion 621, 128 N.J. at 581. The Court ultimately upheld the application of the statute in this limited context. Writing for a unanimous Court, Chief Justice Wilentz noted that "[t]he purpose of the Act is to maintain the public's confidence in government and its officers and employees." Id. at 581. The Court also emphasized that the "appearance of impropriety" can erode the public's confidence that government employees have exercised their authority and carried out their responsibilities in a fair and impartial manner. Id. at 582; See also In re Advisory Committee on Professional Ethics Opinion 705, 192 N.J. 46, 56 (2007).

The Division's "statutory mission is to protect the health and welfare of the children." N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 184 (1994) (citing N.J.S.A. 30:4C-4). As the State agency responsible to safeguard the welfare of our children, the Division must guard against anything that erodes the twin pillars underpinning its statutory mission: "(1) that no child should be exposed to the dangers of abuse or neglect at the hands of their

parent or guardian; and, commensurately, (2) that no parent should lose custody of his/her child without just cause." Division of Youth & Family Services v. J.Y., 352 N.J. Super. 245, 265 (App. Div. 2002).

Our Supreme Court has recognized that few forms of state action are as severe as the termination of parental rights because it irreversibly severs the relationship between children and their biological parents. N.J. Div. of Child Prot. & Perm. v. R.L.M. (In re R.A.J.), 236 N.J. 123, 144 (2018). As our colleague Judge Koblitz succinctly and powerfully stated In re Adoption of Child by J.E.V.:

> After the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights. Such termination "sever[s] the parent-child bond, . . . is irretrievably destructive of the most fundamental family relationship," and "the risk of error . . . is considerable." "[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right."
>
> [442 N.J. Super. 472, 481 (App. Div. 2015) (footnote omitted) (citations omitted).]

In light of the magnitude of the power entrusted to the judiciary and the Division, there are times when it becomes an absolute imperative for this court to state, without equivocation, what is at stake behind the mountain of papers that make up the appellate record in this guardianship trial. Within the nearly

1800 pages that document the history of the Division's involvement in the life of T.S. and her children, the record of this particular case reveals one undeniable truth: the Division caseworkers and supervisors who were responsible to manage this case from its inception were utterly oblivious of their ethical obligations under the standards established by the Legislature in the Conflict of Interest Law and the protocols adopted by the DCF in its Policy Manual.

The contact sheets we have examined in great detail show that none of the Division employees who interacted with T.S., Andrea, and B.O. ever thought to consult the DCF's Ethics Liaison Officer or take any action to investigate the propriety of managing this case under these circumstances. There is clear evidence that the Division's initial family reunification goal quickly morphed into a full blown permanency plan predicated on the termination of the biological parents' parental rights, followed by Andrea's adoption by B.O. We find particularly disturbing that the caseworkers and supervisors involved failed to grasp, as a matter of commonsense, the ethical implications of this material change in direction by the Division and remained indifferent to an arrangement that cast them, as the Division's representatives, in an adversarial role to T.S.'s constitutional rights to parent Andrea. To be clear, this case was tainted with an untenable appearance of impropriety from

28

the moment the Division's district office supervisor knew, or under the circumstances should have known, that B.O. was assigned to serve as the Domestic Violence Liaison in the same local office as the Division caseworker's supervising Andrea's case and thereafter failed to transfer the case to another district office, as per the protocol established in the DCF Policy Manual.

However, what occurred here involved much more than the failure of one district office supervisor. The record shows a wholesale failure to follow any of the protocols established in the DCF Policy Manual and the statutory requirements of the Conflict of Interest Law by all of the caseworkers and supervisors who interacted with this case. The magnitude of the harm caused by this systemic failure cannot be accurately determined by this appellate court. Although the government employees responsible can be held accountable, the harm to T.S., Andrea, and possibly even B.O. in her role as the resource parent needs to be explored and determined by the Family Part in a plenary hearing.

At this plenary hearing, the Family Part must begin with the most vulnerable and truly innocent person most affected by what occurred here, Andrea. The judge must assess what psychological and/or emotional harm Andrea may suffer if she were to be returned to T.S.'s physical custody. The

Division placed Andrea with B.O. immediately after her involuntary emergent removal on January 12, 2016. The child has resided with and been part of B.O.'s family for the past four years. As our Supreme Court has found, and the Division recognizes in its regulations, a young child's "sense of time is different than that for older children or adults." Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 179 (2010) (quoting N.J.A.C. 10:122D-1.14(a)(3)). The Family Part judge must determine whether Andrea's reunification with T.S. is in the child's best interest at this stage of her emotional, psychological, and cognitive development.

Guided by its parens patriae responsibility, the Family Part must determine whether T.S. is capable of safely and responsibly parenting her daughter. These determinations must also be guided by the four-prong standard codified in N.J.S.A. 30:4C-15.1(a), which are not mutually exclusive. They instead overlap "to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). A court's application of the best-interests standard is a fact-sensitive undertaking, which must rely on particularized evidence addressing the circumstances unique to each case. Ibid. Given the passage of time, prudence dictates that updated psychological and bonding studies be conducted

involving T.S., B.O., and Andrea. We leave it to the discretion of the Family Part judge to determine whether any additional information is warranted.

III

The shadow of impropriety and unfairness cast over this case by the failure of the Division to follow the Conflict of Interest of Law and its own Policy Manual and the harm this caused to T.S. and Andrea cannot be overstated. However, this court does not have the jurisdiction to hold the individuals involved here accountable. We thus direct the Appellate Division Clerk to forward a copy of this opinion to the State Ethics Commission Office, the State agency with the "jurisdiction to initiate, receive, hear and review complaints regarding violations, by any current or former State officer or employee or current or former special State officer or employee, in the Executive Branch[.]" N.J.S.A. 52:13D-21(h).

The conduct of the attorneys in this case is not beyond this court's jurisdiction. The Attorney General represents the Division. We expect the DAG's who represent the Division in future cases to inform caseworkers and other Division staff that they are duty bound to disclose to the Family Part all material information related to any conflict of interest affecting the management of the case. This same obligation applies to the Law Guardian

and the Office of the Public Defender or private attorneys who represent a party in these proceedings.

IV

Although the violations of the Conflict of Interest Law are sufficient to vacate the judgment of guardianship and remand for a plenary hearing, we are compelled to note and comment on the trial judge's failure to make key factual findings concerning T.S.'s testimony and address and resolve the inconsistent expert testimony provided by the two psychologists who testified at trial.

Dr. Alan Lee testified on behalf of the Division. He is a licensed psychologist with an independent practice who specializes in clinical and forensic psychology and evaluations and consultation. After conducting a psychological evaluation of T.S., Dr. Lee diagnosed[11] her to have a "maladaptive personality and character traits that are expected to jeopardize and compromise her ability to function as a minimally adequate parent to . . . [a] child [of Andrea's age]." He also opined that T.S.'s parenting knowledge and skills were demonstrably limited in scope and depth as were her insight and awareness of the issues that prevent her from safely reuniting with Andrea.

---

[11] Dr. Lee testified that he used the DSM-IV to diagnose defendant rather than the DSM-V, which is the most recent version of the manual. He claimed the DSM-V does not operate on an axis system. He also claimed the National Institute of Mental Health and other major mental health organizations still utilize the DSM-IV.

According to Dr. Lee, T.S. had impaired cognitive skills and limited intellectual abilities as demonstrated by her IQ score of 73.

Dr. Lee also conducted a bonding evaluation of T.S. and Andrea and one between B.O. and Andrea. He did not find anything acutely problematic during T.S.'s bonding evaluation with the child. Dr. Lee noted Andrea did not show any remarkable aversion or distress to T.S. and they both seemed to enjoy their time together. He noticed, however, that Andrea did not display any observable stress when T.S. left the room as part of the evaluation.

By contrast, Dr. Lee opined that the interactions between B.O. and Andrea were very positive during their evaluation. The quality of their interactions "were relatively more positive and favorable than those during the child being with . . . [T.S.]." He noted that Andrea was "generally more animated, verbal with the resource mother than with [T.S.]." Although the observation periods are important, Dr. Lee emphasized they are only one factor of the overall bonding evaluation. In his opinion, the positive aspects of T.S.'s bonding session were outweighed by her extensive history with the Division. This problem is exacerbated by the fact that Andrea had not been in T.S.'s direct care since she was approximately nine months old.

Dr. Lee opined that Andrea's bond with T.S. was "ambivalent and insecure." This was indicative of a low risk that she would suffer severe or

A-3227-18T3

enduring harm if their relationship were severed. Conversely, Dr. Lee found Andrea shared a significant and positive bond with B.O. In his opinion, there was a significant risk that Andrea would suffer severe and enduring harm if this relationship were terminated. He also opined that B.O. would be more capable to mitigate any potential harm the child would endure if her relationship with T.S. was terminated. Dr. Lee did not support reunification between T.S. and Andrea. He supported the Division's plan of adoption by B.O.

Licensed psychologist Dr. James Reynolds testified for T.S. Based on her self-reporting, Dr. Reynolds testified that T.S. had a stable residence and was gainfully employed. She also received disability support, which he believed was "probably related to her . . . intellectual disability, the borderline intellectual functioning." Based on his evaluation, Dr. Reynolds opined T.S. possessed the capacity to be a fit parent and to adequately and safely care for Andrea. He opined T.S. was capable to adequately and safely develop a healthy support system. He believed T.S. had the "resources, knowledge and skills necessary to safely" parent Andrea.

Given her history of abuse as a child, Dr. Reynolds recommended T.S. receive trauma informed services and therapy and noted the records provided to him did not show any referrals for such services. Dr. Reynolds was also

surprised that T.S. had not been referred for domestic violence counseling and recommended that she participate in this form of counseling.

Dr. Reynolds also conducted bonding evaluations between Andrea, T.S., and B.O. He testified that Andrea appeared to be very comfortable with T.S. and identified and internalized her as a maternal figure. Andrea did not seem uncomfortable, anxious, angry, or ambivalent about T.S. He opined the child interacted with T.S. in an age-appropriate manner and their interactions were positive, joyful, and spontaneous. He noticed that as soon as Andrea saw T.S., she "smiled broadly and approached her for a hug." Andrea called T.S. "mommy" throughout the evaluation and at one point, she "spontaneously kissed [T.S.] on the cheek." He opined that Andrea and T.S. "have a really healthy mother/daughter bond."

Dr. Reynolds also opined that Andrea appeared to internalize B.O. as a maternal figure. He found their interactions were positive, comfortable, and age-appropriate with no indication of negative feelings between the two. He candidly opined that Andrea's bond with T.S. and her bond with B.O. were in equipoise. Each bond was a safe and secure one. Dr. Reynolds concluded that Andrea would experience severe and enduring harm if either relationship were severed. However, he found that the strength of Andrea's bond with T.S.

would help her mitigate the severe and enduring harm of terminating her relationship with B.O.

T.S. testified in her own defense. Her testimony consisted mostly of a wholesale denial or repudiation of anything the Division alleged against her. She denied telling any Division representative that she sold her prescription pain medication. She denied calling L.H. during any of her visits with Andrea or telling the Division about a physical altercation she had with L.H. T.S. conceded that she missed her visitation with Andrea one time due to work or a doctor's appointments. However, she provided the Division with documentation to support her claims.

The Family Part judge's written statement of decision did not directly address the expert witnesses' testimony nor did it make any attempt to reconcile or harmonize their disparate conclusions. Stated differently, we are unable to discern how the judge reached the conclusion that the Division proved, by clear and convincing evidence, that termination of T.S.'s parental rights is warranted. Equally problematic is the judge's failure to determine whether he found T.S.'s testimony credible. These material omissions alone are sufficient to warrant that we vacate the judgment of guardianship and remand the matter for the judge to make the findings of facts and conclusion of law required by Rule 1:7-4(a). As we made clear more thirty years ago:

A-3227-18T3

[F]ailure to perform the fact-finding duty "constitutes a disservice to the litigants, the attorneys and the appellate court." Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion. In the absence of reasons, we are left to conjecture as to what the judge may have had in mind.

[Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990).]

V

This case stands as a model of how not to investigate, manage, and adjudicate a guardianship trial. Under these circumstances, we are compelled to reverse the judgment of guardianship and remand the matter to the Family Part to make specific factual findings and conclusions of law consistent with this decision.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3227-18T3